**Ex parte BILLINGS.**

No. 776.

District Court, D. Kansas.

Sept. 11, 1942.

William D. Reilly, of Leavenworth, Kan., for petitioner.

Lester Luther, Asst. U. S. Atty., of Topeka, Kan., and Captain Allan R. Browne and Lieutenant W. H. Edwards, both of the Judge Advocate General's Department, Leavenworth, Kan., for respondent.

HOPKINS, District Judge.

This is a habeas corpus case. Petitioner contends that he is unlawfully restrained

of his liberty and held for army service by Maj. Gen. Karl Truesdell, United States Army, Leavenworth, Kansas; that petitioner is not a member of the armed forces of the United States, is not subject to military jurisdiction, and that he should be brought before the civil courts for any alleged unlawful act committed by him. In response the Army sets up that petitioner was duly inducted into the Army on or about August 13, 1942, for the duration of the war and that formal charges had been preferred against petitioner for wilful disobedience of a lawful command of his superior under Article of War No. 64, 10 U.S.C.A. § 1536. In reply to this, petitioner states that he is a conscientious objector and urged that claim before his local draft board, and being overruled appealed to the state board, and being denied by the state board, he then presented himself at the reception center, Fort Leavenworth, Kansas, where he was given a physical examination and notified of his acceptance for service in the Army, and thereafter was commanded to stand and take an oath of induction, which he refused, informing the officers that he was a conscientious objector.

The writ was ordered to issue. Petitioner was produced in court and testified at some length.

From petitioner's own testimony it appears that he reported to the reception center at Leavenworth in obedience to orders of his local draft board; that upon reporting he was assigned to barracks, slept there that night, and on the following morning a soldier directed him to the army mess hall where he had his breakfast and proceeded with various tests and examinations, including physical examination. The next step involved finger printing and petitioner balked, saying that if finger printing "involves induction into the army I shall refuse to be finger printed," and speaking to officers in the induction office petitioner explained his intention to refuse to serve in the army and asked to be turned over to the civil authorities. The officers explained that petitioner was already in the army and ordered him to stand and take the oath. Petitioner refused to stand and refused to raise his hand, and after the oath was read to him he said, "I do not. I refuse to take this oath." Petitioner was then ordered to the guard house and this habeas corpus proceeding followed.

We have the question: When is induction actually accomplished? In the movement from civilian to soldier, at what point does the authority of the military attach? Can a draftee, examined and found acceptable and who has been notified of his acceptance and told that he is now in the army, stay beyond the reach of military orders by refusing to take and accept an oath? Has this government become so impotent that in a time of great emergency and danger army service must depend upon acceptance by the citizen? If so, petitioner should be ordered released, but if not, the writ should be denied. The question is one of jurisdiction; jurisdiction of the Army over the petitioner. Sanford v. Robbins, 5 Cir., 115 F.2d 435, certiorari denied 312 U.S. 697, 61 S.Ct. 737, 85 L.Ed. 1132.

Before giving specific consideration to the Selective Training and Service Act, 50 U.S.C.A.Appendix, § 301 et seq., and the rules and regulations made thereunder, it may be of interest to review some of the facts developed by petitioner's testimony.

Petitioner is a single man with no dependents. He is thirty-one years of age, six feet tall and weighs 165 pounds. To all appearances he is a well-developed, able-bodied man. His preliminary education was in this state. He was graduated from the University of Kansas, high in his class; was elected to Phi Beta Kappa. He later attended the University of Paris for two years. Following this he served three years in the diplomatic service in the American Embassy at Moscow. Spent some time in China and Japan. Later studied at Harvard University where he procured his Master's Degree. Is working for a Doctor's Degree. During the past summer he has taught in the University of Texas.

It appears that instead of being a conscientious objector under the regulations and the law, petitioner is an agnostic, as found by the draft board. He likens himself to Socrates and refuses to conform to or abide by any law of the United States that does not suit his whim. While claiming to be a citizen of the United States ("and proud of it"), he says he believes, with some modifications, in the doctrine of Mohandas Gandhi. He says that if the Germans and the Japanese came to take over our country, our people and institutions, he would refuse to resist but would refuse to cooperate with them. He dis-

counts claims of German and Japanese atrocities; says they are greatly exaggerated and asserts that many of the alleged German atrocities of the last war did not in fact take place.

It is helpful to review some of his testimony in considering the question presented:

"I have friends who are professors of law there at the University of Texas also, and they were rather interested in my case and they looked up the law and they told me. * * *

"Q. (Interrupting) When did they do that? A. Oh, this was last January.

"Q. You were sort of getting ready for this business? A. Oh, yes, I have expected to go to prison if I passed the physical examination. I expected to go to prison anyway. I had made up my mind I would never serve in the army and I would take the consequences, whatever they might be, so I had inquired from everybody who I thought might know about the draft law. I went to the state draft headquarters at Austin, Texas. The draft headquarters are in the same city as the University and the state officials of the draft there, who are army men, informed me that I was not in the army until or unless I took the oath of induction and took the physical examination.

"Q. You know some of these officers might be mistaken as to what the law is. A. Yes, they might be, but I take also a conscientious objector newspaper. * * * A. And in this magazine they reported a number of cases. They record cases. That is mainly, what the magazine is for, to inform other conscientious objectors.

"Q. Well, you have been studying and working on this question then for a good many months, I take it? A. Oh, yes, after all, it involved my whole life, my future and everything.

"Q. Did you tell some folks that you were going to take this physical examination and you thought likely you wouldn't pass, but if you did, then you were going to refuse to serve? A. Oh, yes, I told many people that. * * *

"Q. Yes. Why do you seek to get into the civil courts? If you don't believe in everybody obeying the laws and the rules, why do you wish to submit your matter to any court? A. Well, I don't know. It is sort of like Socrates drinking the hemlock. I thought the law was unjust, but I didn't feel the call to evade it.

\* \* \* \* \*

"Q. Have you ever voted at elections? A. Yes, oh, surely.

"Q. Did you vote for a congressman? A. Yes.

"Q. Did you expect him to vote to adopt laws that you wouldn't abide by? A. Well, no.

\* \* \* \* \* \*

"Q. Anyhow, why do you prefer the civil courts since there are two options? Why do you prefer the civil courts rather than the court martial of this army? A. Well, I don't know. * * * I think the civil courts are more objective and more fair; that they will convict me of what I am actually guilty of, for refusing to serve. * * * I was simply flabbergasted when the army authorities succeeded in holding me after this physical examination because every inquiry I have made, and I have made them from the army officers in charge of the state draft offices in Texas, I have made them from professors of law; one of them was a visiting professor of law who was there at Texas and he looked the thing up. Everybody said without any hesitation that you were not in the army until you subscribed to the oath of induction, until you took the oath of induction, and taking the physical examination did not put you outside the jurisdiction of the civil courts."

\* \* \* \* \* \*

"The Court: You were seeking protection from the army? A. That is right. Yes, I was, yes. That is right. I was not seeking to be protected by the army, but to be protected from the army."

Referring to the attempt of a friend to change him:

"A. He was a volunteer, too. He spent all his time trying to get me to see the light, trying to make me believe it was my duty.

"The Court: To be really a true American Citizen? A. Well, to go into the army, which he thinks. is serving America, but I don't think the army is serving the best interests of this country. * * *"

Speaking of his refusal to put on a uniform, petitioner testified:

"The Court: What is this you have on? A. This is the same kind of thing they

666

are wearing. This is supposedly the army thing.

"The Court: Isn't it the regular army uniform? A. Yes, it is.

"The Court: You call it, 'this thing.' A. Well, you see I view the army somewhat differently from what the majority of people do.

"The Court: From what ordinary Americans do. You don't claim to be an American, do you? A. I certainly do, sir, and I am very proud of that fact."

Petitioner was quick to seek the court and the aid afforded by its processes. He draws upon rights accorded to him and all others alike, and without prejudice by reason of the somewhat ambiguous philosophy disclosed in his testimony.

■ The history of the writ of habeas corpus is lost in antiquity. But it was in use before Magna Charta and exists today as part of the fundamental law of the land. It is a writ which cannot be abrogated or its efficiency curtailed by legislative action. Its position is made secure by the provisions of Article I, Section 9 of the Constitution.

Judge Murrah of the Tenth Circuit Court of Appeals has said: "The writ of habeas corpus is a shield that guards and protects the constitutional liberties of the American citizen. Through it we inquire to see whether fundamental rights have been violated. Its function or use should not be construed or employed so narrowly as to defeat the salutary purpose it serves in our system of government." Lunsford v. Hudspeth, 126 F.2d 653, 659.

■ Habeas corpus in character is that of a civil proceeding. It seeks the enforcement of civil rights. Resort to the writ is had not to inquire into the criminal act of which complaint is made, but into the right of liberty, notwithstanding the act, and the immediate purpose to be served is relief from illegal restraint.

■ The ultimate inquiry is the jurisdiction of the holding authority (here the Army). Collins v. Johnston, 237 U.S. 502, 35 S.Ct. 649, 59 L.Ed. 1071; Frank v. Mangum, 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969.

The pertinent inquiry in a habeas corpus proceeding is to determine the jurisdiction of the court (in this instance the Army), pronouncing the sentence, or procedure, and giving the judgment. If the court (or the Army), has jurisdiction, any irregularities in procedure or decision are matters for appeal and cannot be reviewed in habeas corpus.

■ The Selective Training and Service Act of 1940, Section 11, 50 U.S.C.A. Appendix, § 311, carries a provision that: "No person shall be tried by any military or naval court martial in any case arising under this Act unless such person has been actually inducted for the training and service prescribed under this Act or unless he is subject to trial by court martial under laws in force prior to the enactment of this Act."

This provision in the new Act is in absolute harmony with the earlier decisions of the courts interpreting that part of the Second Article of War, 10 U.S.C.A. § 1473, that persons subject to military law shall include all persons "lawfully called, drafted, or ordered into, or to duty or for training in the said service, from the dates they are required by the terms of the call, draft or order to obey the same." The decisions under this provision held that until actually inducted the rights of the party are determined by the civil law. Ex parte Henderson, 11 Fed.Cas. page 1067, No. 6,349; Ex parte Goldstein, D.C., 268 F. 431; United States v. McIntyre, 9 Cir., 4 F.2d 823; Ver Mehren v. Sirmyer, 8 Cir., 36 F.2d 876.

Induction—When and how accomplished, is the question presented. Petitioner contends that for one to be finally inducted he must not only be acceptable and so notified, but he must agree to accept service; that he must take the oath; that law or regulation to the contrary is unconstitutional; that failure to take the oath of allegiance continues in effect the police power of the civil authorities and the force that restrains the cloak of military authority descending upon the selectee.

The Selective Training and Service Act of 1940, 50 U.S.C.A. Appendix, § 301 et seq., and the Service Extension Act of 1941, 50 U.S.C.A. Appendix, § 351 et seq., provide for registration of persons liable for training and service, exemption, deferments, terms, etc. But these Acts do not set out the procedure for induction. There was delegated to the President the authority "to prescribe the necessary rules and regulations to carry out" the provisions of the Act.

Rules and regulations now in effect and in effect at the time petitioner presented himself at the Leavenworth reception cen-

ter carry no provision for the giving of an oath as an incident to induction. The pertinent regulations read:

633.1 "Immediately upon determining which men are to report for induction, the local board shall prepare for each man an Order to Report for Induction (Form 150), in duplicate. The local board shall mail the original to the registrant and shall file the copy in his Cover Sheet (Form 53)."

633.2 "After selecting the registrants who are to fill the call, the local board shall designate one selected man to be the leader of the group and one or more to be assistant leaders."

633.2 "(c) Leaders and assistant leaders shall have such authority as is necessary to deliver the group to the induction station."

633.3 "Before the time set for selected men to report for delivery to the induction station, the local board shall prepare a Delivery List (Form 151), in triplicate."

633.4 "Before the time set for selected men to report for delivery to the induction station, the local board, unless otherwise directed, shall prepare Government Requests for Transportation (Standard Form No. 1030) and Government Request for Meals or Lodgings for Civilian Registrants (Form 256)."

633.6 "Procedure before Delivery. (a) At the time and place designated for the selected men to report for delivery, the local board shall:

"(1) Call the roll of selected men.

"(2) Read and issue the appointment of the leader and assistant leaders.

"(3) Turn over to the leader the transportation request or tickets, the meal and lodging requests, and the records for the induction station.

"(4) Notify the leader of arrangements that have been made at the induction station for the reception of the selected men.

"(5) Specifically order the selected men to obey the leader and assistant leaders.

"(6) Specifically order the selected men to report to the induction station."

633.8 "In the manner and to the extent prescribed by regulations of the land or naval forces, the commanding officer of the induction station is required to have the selected men met at the railroad station or bus terminal, transported to the induction station, and provided with food and lodging after their arrival and *pending their induction or rejection.*"

633.9 "At the induction station, the selected men found acceptable will be inducted into the land or naval forces."

Pertinent also is Regulation 601.8, which defines *Induction station* as any camp, post, etc., where selected men are received by the military authorities and if found acceptable are inducted into military service.

■ This court takes judicial notice that there exists an induction station on the Fort Leavenworth Military Reservation where this petitioner was received and found acceptable.

As to the regulations on induction (now Section 633.9 but formerly Par. 429) it is important to note that the earlier regulation, Par. 429, contained the provision that: "After examination at the induction station, the selected men found acceptable will be inducted into the land and naval forces. An officer of the Army, Navy, or Marine Corps will administer a prescribed oath to each of the men. He will then inform them that they are members of the land and naval forces, and will explain their obligations and privileges."

There can be no question but that petitioner is subject to the military law. The question is not close enough even to be debatable. The amendment of the regulation to eliminate the provision for the administration of an oath undoubtedly was done to avoid question being raised and to avoid waste of army time and effort in resisting such improvident proceedings as the one here.

I would be of like opinion if Paragraph 429 of the earlier regulation were still in effect. After a draftee has reported to a reception center and has been subjected to his physical and other examinations, has passed said examination and has been notified of his acceptance, the giving of an oath and admonition that you now are in the Army, constitute mere formality. A desirable step, perhaps; but merely formal, none the less. The whole statutory procedure outlined in the Act and the Regulations thereunder culminating in petitioner's examination and notice of acceptance operated as *Induction.*

■ Induction is completed upon acceptance by the government and irrespective of the desires, acts and mental attitudes of the party affected. Upon acceptance by

668

the government, induction occurs by operation of law. It is something over which the party affected, petitioner in this case, has no control. It is not the acceptance by him of the oath, but the acceptance by the government of him as a soldier.

There is a point of difference in this respect as between a party brought into the service by operation of the draft act, and one who volunteers his services. As to the latter, Article of War 109, 10 U.S.C.A. § 1581, requires that at the time of his enlistment every soldier shall take a prescribed oath. And see Franke v. Murray, 8 Cir., 248 F. 865, L.R.A.1918E, 1015.

It should be borne in mind in this case that petitioner's actions as disclosed by his testimony are the result of long deliberation, consultation and study, and careful calculation, and that he has in fact fully complied with the requirements of the Selective Training and Service Act. There may be some question as to whether he has committed an act for which he can be prosecuted in the civil courts, and an order from this court releasing him from the military authority might have the anomalous result that petitioner would walk away scotfree of both the military and civil authorities.

In considering matters of this kind we must not overlook the fact that our country is at war; that its very life is at stake, and that soldiers are necessary. If half the young men of our country were disposed, as this individual, we would indeed be easy prey for the powers that have set out to enslave humanity and destroy freedom everywhere. He appears to be a perfect example of what any ordinary, red-blooded American would dub "an over-educated, egotistical, scholastic slacker."

■ The Selective Service Act, under which the petitioner is held by the Army, is based on the principle that every citizen owes it as a duty to defend this nation. As said in United States v. Dewey, D.C., 37 F.Supp. 449, 451:

"Under its terms, the burdens of military service will be borne equally by all classes regardless of economic means. We should remember that in order to have the privileges and benefits of citizenship in this country, we each must assume some burdens and discomforts. We should examine our own moral fibre and character and above all, do our duty. The times make it imperative that every one of us should realize that he owes everything he has, his life, his property, and everything else, to the cause of preserving the liberties we cherish. So far as is necessary, our Government has the right to call upon us to make that sacrifice. * * *

"Every intelligent person knows that the power to make such a decision is one of the most essential, vital, and momentous of all the powers of government. We cannot maintain our independence or protect our citizens against oppression or continue to be free, without such power being delegated to some authority, and one of the chief duties of citizenship in a time of great emergency like this is to recognize such authority."

The spirit of the petitioner is one of rebellion against the laws of the United States, against his government. The effect of his action and those like him is to hinder the war effort the government deems necessary in this distressing emergency. If half the young men should decide to violate some law or refuse to abide by some rule of law of which they disapprove, we would have anarchy. The purpose and effect of such an attitude would be so plain that it would be impossible not to conclude that such citizens are at heart traitors to their country.

"When the Axis powers did actually apply their principles of action to other peaceful nations by invasion, they violated every solemn covenant they had made to observe the law and neutrality established for the protection of peaceful states. They ruthlessly sent their armed forces to do pillage and destruction to their peaceful neighbors. They committed wholesale murder of defenseless old men, women and children, without warning and in contempt of every law and the dictates of humanity." United States v. Dewey, supra.

In the face of all these atrocities, this petitioner is one of the very few willing to violate the laws of his country and indirectly at least give aid and comfort to these world assassins.

In this country we have a natural abhorrence of compulsion. We like to believe that when danger threatens the country every individual citizen will come forward immediately and voluntarily do his duty. Not so with this petitioner.

It is a matter of common knowledge that during past generations this country

has shown great sympathy to Japan and the Japanese people. On occasions we have been more than generous when disaster has come to them.

After the attack upon Pearl Harbor, which resulted in the murder of more than three thousand of our finest young men, Secretary of State Hull stated in substance, that this attack upon the United States was treacherous and utterly unprovoked; that the Japanese professions of desire for peace, (at the very moment of the attack), were "infamous, false and fraudulent."

Notwithstanding all this, the petitioner says that Japan was justified (partly) in such treacherous attack.

It is difficult to understand how such apparent disloyalty could abide in the soul of any human being; a disloyalty as foul as treason itself.

He now comes petitioning the court for relief from the responsibility of performing the smallest duty to the country that has, according to his own testimony, showered upon him its blessings, and bounty.

Might it not be said that were he given his just deserts, he would be consigned to the German and Japanese murderers, where common, decent, human actions and sympathy abide not?

The government through its regularly constituted channels has classified each man of soldier age according to his ability. In this period of storm and stress each one of us should classify himself in a questionnaire something like the following:

Am I an American citizen?

Do I realize or comprehend what it means to be a citizen of this country?

Do I realize the bountiful blessings that I here enjoy? The blessings of liberty and freedom?

Have I done my full share in the great struggle to preserve in my country the blessings of liberty and to resist everywhere the atrocious will of the barbarian dictators who would enslave the world?

Have I cooperated in every way in carrying on the war effort?

Have I done everything within my power, and willingly, to promote production of the weapons of war, or is it possible that I have been a profiteering parasite? a slacker? a drone? or even a striker?

Have I actually given the enemies of my country cause to rejoice by impeding our war effort by aiding or abetting the stoppage of work, or going on strike?

Every person and every organization in our nation should be cooperating in the war effort. If doubt existed whether the Army's interpretation was correct of any provision of the Selective Service Act, or of the regulations thereunder, that doubt should be resolved in favor of the Army's view. But I think there is no doubt. The United States Army has jurisdiction of this petitioner.

I am of the opinion the writ should be denied; the petition dismissed, and an appropriate order may accordingly be submitted.