BILLINGS *v.* TRUESDELL, MAJOR GENERAL, UNITED STATES ARMY.

No. 215. Argued February 2, 1944.—Decided March 27, 1944.

*Mr. Lee Bond* submitted for petitioner.

*Mr. Edward G. Jennings,* with whom *Solicitor General Fahy, Assistant Attorney General Tom C. Clark,* and *Messrs. Robert S. Erdahl, Valentine Brookes,* and *Malcolm A. Hoffmann* were on the brief, for respondent.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Sec. 11 of the Selective Training and Service Act of 1940 (54 Stat. 894, 50 U. S. C. App. § 311) provides that "No person shall be tried by any military or naval court martial in any case arising under this Act unless such person has been actually inducted for the training and service prescribed under this Act or unless he is subject to trial by court martial under laws in force prior to the enactment of this Act."[1] Petitioner Billings, who is held by the Army on a charge of a violation of the Articles of War, claims that this provision of the Act exempts him from military jurisdiction and makes him responsible solely to the civil authorities. The answer turns on whether or not Billings has been "actually inducted" into the Army. These are the facts.

---

[1] Sec. 11 so far as material here provides: "Any person . . . who in any manner shall knowingly fail or neglect to perform any duty required of him under or in the execution of this Act, or rules or regulations made pursuant to this Act, . . . shall, upon conviction in the district court of the United States having jurisdiction thereof, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment, or if subject to military or naval law may be tried by court martial, and, on conviction, shall suffer such punishment as a court martial may direct. No person shall be tried by any military or naval court martial in any case arising under this Act unless such person has been actually inducted for the training and service prescribed under this Act or unless he is subject to trial by court martial under laws in force prior to the enactment of this Act."

Billings claims to be a conscientious objector. He registered under the Act with Local Board No. 1 of Ottawa County, Kansas, stating on his card at the time that he would never serve in the Army. He was given a 1–B classification because of defective eyesight but was reclassified as 1–A in January, 1942. The local board rejected his claim that he was a conscientious objector. He appealed to the board of appeal which affirmed the ruling of the local board. Though petitioner resolved never to serve in the Army, he desired to comply with all of the requirements of Selective Service short of actual induction, so that he might avoid all civil penalties possible. Accordingly, he consulted with draft officials in Texas and faculty members at the University of Texas where he taught and concluded that taking the oath was a prerequisite to induction into the armed forces. He thought he might be finally rejected by the Army on account of defective eyesight. But he resolved that if he was not rejected at the induction station, he would not take the oath but would turn himself over to the civil authorities. He was ordered by his local board to report on August 12, 1942 and to proceed to the induction center at Fort Leavenworth. He joined the group selected for induction and was transported to Fort Leavenworth where he and the others in his group spent the night in the barracks. The next morning after breakfast in the mess hall petitioner was given both the physical and mental examinations during which he made clear to the examining officials his purpose not to serve in the Army. He then reported to the officer who passed on the results of the examinations and who told him that he had been put in Class 1–B. He then reported to the induction office and told the officers in charge that he refused to serve in the Army and that he wanted to turn himself over to the civil authorities. They said that he was already under the jurisdiction of the military and put him under guard to prevent him from

leaving the reservation. With their consent, however, he used the telephone and procured the services of an attorney whom he retained to file a petition for *habeas corpus* on his behalf. Thereupon an Army officer read petitioner the oath of induction which petitioner refused to take. He was advised that his refusal made no difference, that "You are in the army now." He was then ordered to submit to fingerprinting. He refused to obey. Military charges were preferred against him for willful disobedience of that order.

On August 14, 1942, petitioner filed this petition for a writ of *habeas corpus* alleging that he was not a member of the armed forces of the United States, that he was not subject to military jurisdiction, and that if he had violated any laws they were the civil laws of the United States. The writ issued. Respondent filed a return and a hearing was had at which petitioner testified. The District Court discharged the writ and remanded petitioner to respondent's custody, holding that petitioner was subject to military jurisdiction. 46 F. Supp. 663. The Circuit Court of Appeals affirmed, holding that "Induction was completed when the oath was read to petitioner and he was told that he was inducted into the Army." 135 F. 2d 505, 507. The case is here on a petition for a writ of certiorari which we granted because of the importance of the problem in the administration of the Act.

## I.

It is conceded that petitioner was not "actually inducted" in the Army within the meaning of § 11 of the Act when he was ordered to report to the induction station. But it is contended that from that time on he was subject to at least a limited military jurisdiction by reason of the Articles of War.

Among those whom Article 2 of the Articles of War (41 Stat. 787, 10 U. S. C. § 1473) subjects to military law are

all persons "lawfully called, drafted, or ordered into, or to duty or for training in, the said service, from the dates they are required by the terms of the call, draft or order to obey the same." This provision standing alone would have made petitioner subject to military law from August 12, 1942, the date when he was required by the local board to present himself for induction. That was indeed the consequence under the Selective Draft Act of 1917 (40 Stat. 76). *Franke* v. *Murray,* 248 F. 865; *United States* v. *Bullard,* 290 F. 704; Digest Op. J. A. G. 1912–1930, § 2238; 2 Op. J. A. G. (1918) 327.3; Second Report, Provost Marshal General (1918), p. 221. The Articles of War then in force (39 Stat. 651) had substantially the same provision as the present Article 2. Sec. 2 of the 1917 Act provided, moreover, that "All persons drafted into the service of the United States . . . shall, from the date of said draft or acceptance, be subject to the laws and regulations governing the Regular Army . . ." 40 Stat. 78. And the regulations under the 1917 Act stated that when a registrant was ordered to report to a local board or a state adjutant general for duty he was "in the military service" from and after the day and hour thus specified. §§ 133, 159D, 159E, 159F, 159G, 161. And see *United States* v. *McIntyre,* 4 F. 2d 823. But the present Act and the regulations promulgated under it are differently designed.

Sec. 3 of the Act provides that "no man shall be inducted for training and service under this Act unless and until he is acceptable to the land or naval forces for such training and service and his physical and mental fitness for such training and service has been satisfactorily determined." Moreover, as we have noted, Congress by § 11 withheld from military courts martial jurisdiction over cases arising under the Act unless the person involved had been "actually inducted" or "unless he is subject to trial by court martial under laws in force prior to the enactment of this Act." The "actually inducted"

clause of § 11 was offered as an amendment on the floor of the Senate by Senator Bone. 86 Cong. Rec. 10895. It was designed, as stated by the Senate conferees, to give civil courts jurisdiction over violations of the Act prior to induction for training in substitution for the House provisions that civil and military courts should have concurrent jurisdiction in such cases. 86 Cong. Rec. 11710, 12039, 12084. In view of this legislative history the Congress can hardly be presumed to have restored by the second "unless" clause in § 11 what it took away by the first "unless" clause. That is to say, § 11 of the Act read together with § 3 indicates to us a purpose to vest in the civil courts exclusive jurisdiction over all violations of the Act prior to actual induction. It is suggested, however, that prior to that time a selectee may be subject to military jurisdiction by reason of Art. 2 of the Articles of War and be prosecuted before courts martial for all offenses proscribed by the Articles, provided those acts are not made criminal by the Act. Under that view a selectee who failed to report for induction (*Bowles* v. *United States,* 319 U. S. 33) or who, having reported, refused to be examined (*United States* v. *Collura,* 139 F. 2d 345) could be prosecuted for such offenses only in civil courts. § 11. But since by Art. 2 he became a soldier when ordered to report, he could be prosecuted by the military for those offenses which were proscribed by the Articles of War but not by the Act.

We think that is too narrow a reading of § 11 of the Act. As we pointed out in *Falbo* v. *United States,* 320 U. S. 549, 552, the mobilization program established by the Selective Service System is designed to operate "as one continuous process for the selection of men for national service"—a process in which the civil and military agencies perform integrated functions. The examination of men at induction centers and their acceptance or rejection are parts of that process. Induction marks its

end. But prior to that time a selectee is still subject to the Act and not yet a soldier. A case involving his rights or duties as a selectee prior to that event is a case arising under the Act. The civil authorities, not the military, are charged with the duties of enforcement at that stage of the process. That necessarily means that the measure of a selectee's rights and duties is to be found in the Act, not in the Articles of War. For § 16 (a) of the Act suspends all laws or parts thereof which are in conflict with its provisions.

We are supported in that view by the administrative construction of the Act. The regulations promulgated under it define a "delinquent" as one who is "liable for training and service" under the Act and "who fails or neglects to perform any duty required of him" by the Act or the regulations made pursuant thereto. § 601.5. And Part 642, which contains detailed provisions concerning the rights and duties of "delinquents," provides: "Every registrant who has heretofore or who hereafter fails to comply with an Order to Report for Induction or an Order to Report for Work of National Importance shall be reported promptly to the United States Attorney . . .; provided that if the local board believes that by reasonable effort it may be able to locate the registrant and secure his compliance, it may delay the mailing of such Delinquent Registrant Report for a period not in excess of 30 days." § 642.41 (a). Moreover, § 642.42 (a) provides: "After a delinquent has been reported to the United States Attorney, it is the responsibility of the United States Attorney to determine whether he shall be prosecuted. Before permitting such a delinquent to be inducted or assigned to work of national importance, the local board should obtain the views of the United States Attorney concerning such action." We will develop shortly the place of such regulations in the Selective Service System. It is sufficient at this point to

note that the regulations treat the problems of "delinquents" as matters exclusively for the civil authorities.[2] We cannot believe that the Act would have been given that construction if, as is now contended, the selectee became subject to even a limited military jurisdiction prior to induction.

## II.

Respondent argues in the second place that petitioner became a soldier when the Army accepted him after his examinations were completed. That argument is based largely on the War Department Regulations.

The War Department Regulations [3] in force in August, 1942 (Mobilization Regulations No. 1–7, October 1, 1940) provided in § II, par. 6, that "The function of the induction station is to provide the final examinations for registrants selected for induction and the induction of those acceptable to the Army." Sec. II, par. 13 (e) entitled "induction ceremony" provided: "All men successfully passing the

---

[2] While the regulations governing "delinquents" cited in the text are those presently in force, the ones in effect at the time of Billings' refusal to be inducted were of the same tenor and were then included in § 601.5, § 642.4, § 642.5.

It should also be noted that these regulations contain detailed provision for the parole of persons convicted of violations of the Act. §§ 643.1 *et seq.* Those required to register under the Act may be paroled by the Attorney General on the recommendation of the Director of Selective Service for induction or for other assignments. § 643.2. The Attorney General has the power to impose "such terms and conditions as he may deem proper" upon the parolee and shall supervise him, and may suspend or revoke the parole, except when the parolee is "in the active land or naval forces of the United States." §§ 643.8, 643.9. And Army Regulations No. 615–500, § II, par. 7 (b) (5) provide that registrants convicted of violation of the Act "will be accepted for induction at any time," provided the Attorney General of the United States has granted parole "for the purpose of induction."

[3] These were superseded September 1, 1942, by Army Regulations No. 615–500.

physical examination will be immediately inducted into the Army. The induction will be performed by an officer in a short, dignified ceremony in which the men are administered the oath, AW 109: 'I, —————, do solemnly swear (or affirm) that I will bear true faith and allegiance to the United States of America; that I will serve them honestly and faithfully against all their enemies whomsoever; and that I will obey the orders of the President of the United States and the orders of the officers appointed over me, according to the rules and Articles of War.' They will be informed that they are now members of the Army of the United States and given an explanation of their obligations and privileges. In the event of refusal to take an oath (or affirmation) by any individual he will not be required to receive it, but will be informed that this action does not alter in any respect his obligation to the United States."

The argument is that since the Army Regulations do not condition a selectee's entry into the Army on his subscribing to the oath,[4] induction must take place at some anterior point of time. It is said that while § 3 of the Act provides that a selectee shall not be inducted "until he is acceptable" to the Army, there is nothing in the Act which postpones induction beyond that time. The induction ceremony described in § II, par. 13 (e) of the regulations is said to be a formal exercise which solemnifies the occasion and during which the soldier is advised concerning his obligations and responsibilities to the United States. See *United States* v. *Smith*, 47 F. Supp. 607. The statement in § II, par. 13 (e) that those who pass the examination "will be immediately inducted into the Army" is read to mean that selectees

---

[4] The case of a selectee is distinguished from that of an enlistee who is required by Art. 109 of the Articles of War to take the oath. Identical requirements in the predecessor Articles of War applicable to enlistees were construed as inapplicable to draftees under the Selective Draft Act of 1917. See 1 Op. J. A. G. 169 (1917); *Franke* v. *Murray*, *supra*, pp. 868–869.

shall thereupon be accepted as soldiers. A statement by an officer in authority that they are accepted, followed by the reading of the oath and such other explanation as may be required completes the ceremony.

That view finds support in informal rulings of the Judge Advocate General's office.[5] And War Department Regulations have the force of law as we recently had occasion to reaffirm in *Standard Oil Co.* v. *Johnson,* 316 U. S. 481, 484.

But that circumstance is complicated here by the division of jurisdiction between the civil and military authorities which the Act creates. The President is authorized "to select and induct" men into the armed forces "in the manner provided in this Act." § 3 (a). No man shall be "inducted for training and service under this Act unless and until he is acceptable" to the armed services. § 3 (a). And the civil authorities retain jurisdiction over him until

---

[5] The following propositions were submitted to the Chief, Military Affairs Section of the Judge Advocate General's office: "1. That the only purpose of the administration of the oath as set out in MR 1–7, Paragraph 13e, is for the purpose of informing the individual of his obligations and responsibilities to the United States of America, and his acquiescence in, or acknowledgment of this obligation, by some overt act indicating acceptance thereof is immaterial. 2. That induction is complete immediately upon full acceptance of the individual by the government. The oath or any act or requirement thereafter is ministerial only and is not necessary to the completion of induction. 3. For induction no acquiescence or acceptance on the part of the individual is required."

On June 6, 1941, the following informal ruling was made: "Generally speaking, the above-quoted conclusions are believed to be sound, and it therefore follows that a refusal on the part of a selectee to take the prescribed oath does not legally affect the validity of his induction." We are advised by the Judge Advocate General on February 4, 1944, in a supplemental memorandum filed by the Solicitor General that although that opinion was expressed informally by letter and not in a formal opinion it "represented the views of The Judge Advocate General" and that those views "have not been modified and are hereby adhered to."

he is "actually inducted." § 11. Thus it seems clear, as we have already said, that the Act, rather than the War Department Regulations or the Articles of War, determines the rights and duties of selectees, as distinguished from inducted men. The manner and method of effecting an induction into the Army are thus left for the War Department. But the power of the President under the Act "to select and induct" men includes the power to determine when the selective process is completed. It is only after that process is finished that a selectee is eligible for induction.

That view runs throughout the Selective Service Regulations promulgated under the Act. They are the regulations which have special relevancy here. The rulemaking power under the Act is vested in the President. § 10 (a) (1). The President in turn is given the power to delegate that authority.[6] § 10 (b). And during the period here in question, as at the present time,[7] the President had delegated it to the Director of Selective Service. Exec. Order, No. 8545, Sept. 23, 1940, 5 Fed. Reg., pp. 3779, 3781. The Act and the regulations promulgated under it give the selective process its integrated nature. *Falbo* v. *United States, supra.* They determine the role which the military as well as the civilian authorities are to play in the administrative process of selection. *Id.* As in other instances (*United States* v. *American Trucking Assns.,* 310 U. S. 534, 549; *Gray* v. *Powell,* 314 U. S. 402) the interpretations of an Act of Congress by those

---

[6] Sec. 10 (b) as originally enacted contained no limitation as to the persons to whom that authority might be delegated. But by the Act of December 5, 1943, 57 Stat. 598, § 10 (b) was amended to read: "The President is authorized to delegate to the Director of Selective Service only, any authority vested in him under this Act (except section 9)."

[7] See Exec. Order No. 9410, December 23, 1943, 8 Fed. Reg. 17319.

charged with its administration are entitled to persuasive weight.

As we have said, the Selective Service Regulations support our interpretation of the Act. Thus it is provided that while a selectee is appealing or otherwise contesting his classification, his induction shall be stayed. §§ 625.3, 626.14, 627.41, 628.7. And, as we have noted, when a "delinquent" has been reported to a United States Attorney, the local board shall not order him to report for induction without obtaining the views of the United States Attorney. These provisions, as well as those governing the control of the local boards over the orders to report for induction, which we will come to shortly, are framed on the theory that the time when a selectee's status may change from civilian to soldier is subject to the terms and requirements of the Act. Thus they confirm our construction of the Act.

The Selective Service Regulations also draw a distinction between acceptance (or being found acceptable) by the Army and induction. During the period here in question an inducted man was defined as "a man who has become a member of the land or naval forces through the operation of the Selective Service System." 32 Code Fed. Reg. 1941 Supp. § 601.7. Induction station was defined as any camp, etc. "at which selected men are received by the military authorities and, if found acceptable, are inducted into military service." § 601.8. And though the regulation governing the reception of selected men at the induction station referred to their treatment "pending their induction or rejection" (§ 633.8), "induction" was not otherwise used in the sense of "acceptance." For it was defined in the very next regulation in the following manner: "Induction. At the induction station, the selected men found acceptable will be inducted into the land or naval forces." § 633.9.

These regulations thus suggest that induction follows acceptance and is a separate process. Read in that light the War Department Regulations may be reconciled with the regulations under the Act. For as we have seen, the War Department provided by regulation at the time Billings appeared at Fort Leavenworth that the "induction *will be performed* by an officer in a short, dignified ceremony in which the men are administered the oath," etc. (Italics added.)

We are confirmed in this conclusion by recent amendments both to the Army Regulations and to the Selective Service Regulations. The Army Regulations, as amended March 30, 1943, now state respecting the "induction ceremony," that "The induction will be performed by an officer who, prior to administering the oath, will give the men *about to be inducted* a short patriotic talk" (italics added). This makes unambiguous the fair inference in the earlier Army Regulations that selectees were inducted *by* the ceremony and not before it.

Moreover, the Selective Service Regulations have been amended in recent months so as to provide for preinduction physical examinations before a registrant "is ordered to report for induction." § 629.1. As under the former regulations, the group to be forwarded for examination by the military authorities is assembled by the local board and given certain instructions and credentials. § 629.22. Registrants in certain classes "may be inducted into service at the induction station upon being found qualified for service," provided they make written request of their boards and provided there is no appeal pending in their cases and the appeal period has expired. § 629.23. All other registrants who are given the preinduction examination are returned to their local board when the examination is completed. § 629.22 (e). Those found acceptable by the Army or Navy are later ordered to report for induction. §§ 632.1 *et seq.* Local boards, in filling

calls received, are authorized to allow twenty-one days before induction to those who "have been found to be acceptable to the Army." § 632.4. This takes the place of the earlier system whereby selectees were first inducted and then given, if they desired, furloughs to attend to their personal affairs. Army Reg. No. 615–500, September 1, 1942, § II, par. 16.

We mention these recent regulations because they perpetuate the distinction between acceptance or being found acceptable and induction which appeared in the regulations when Billings reported at the induction station. That these amendments do not effect any change in the concept of "induction" is apparent from the fact that its definition has remained practically the same from the time when Billings reported at the induction station to the present time.[8] It could hardly be maintained that a selectee who has passed his preinduction physical examination but who has not been ordered to report for induction is subject to military jurisdiction. And it would not seem permissible to hold that he who failed to report for induction at the end of the so-called twenty-one day furlough period could be prosecuted by a court martial because he had been "actually inducted" within the meaning of § 11. But if that is true, it is difficult to see why there would be a difference in result if the interval between the time when he is found acceptable or is accepted and the ceremony of induction were only a few minutes, as in the present case, rather than a few weeks.

---

[8] As we have indicated, the Selective Service Regulations in § 633.9 defined "induction" at the time Billings reported to the induction station as follows: "At the induction station, the selected men found acceptable will be inducted into the land or naval forces." At the present time § 633.25 defines "induction" as follows: "At the Army Reception Center, the Navy Recruiting Station, or the induction station, as the case may be, the selected men who have been forwarded for induction and found acceptable will be inducted into the land or naval forces."

## III.

It is finally contended, as the Circuit Court of Appeals held, that petitioner was inducted when the oath was read to him and he was told that he was in the Army. At that time he had been placed under guard and was retained against his will. But the argument is that the military has authority to exercise force for the purpose of inducting selectees into the service.

We have no doubt of the power of Congress to enlist the manpower of the nation for prosecution of the war and to subject to military jurisdiction those who are unwilling, as well as those who are eager, to come to the defense of their nation in its hour of peril. *Arver* v. *United States,* 245 U. S. 366. But Congress did not choose that course in the present emergency. It imposed a separate penalty on those who defied the law—prosecution by the civil authorities and a maximum penalty of five years imprisonment or a $10,000 fine or both. § 11. We say that that penalty was aimed at those who defied the law, though in the words of § 11 it includes, of course, only those who have not been "actually inducted." But we give "inducted" the meaning it has in the Act and in the regulations. As we have pointed out, an inducted man is defined by the Selective Service Regulations as one "who has become a member of the land or naval forces through the operation of the Selective Service System." § 601.7. That suggests that he becomes "actually inducted" within the meaning of the Act by submitting to the Selective Service System. The fact that he is not a volunteer is, of course, irrelevant as the Act was designed as a "fair and just system of selective compulsory military training and service." § 1 (b). But induction under the Act and the present regulations is the end product of submission to the selective process and compliance with the orders of the local board.

It must be remembered that § 11 imposes on a selectee a criminal penalty for any failure "to perform any duty required of him under or in the execution" of the Act "or the rules or regulations made pursuant thereto." He who reports to the induction station but refuses to be inducted violates § 11 of the Act as clearly as one who refuses to report at all. *United States* v. *Collura, supra.* The order of the local board to report for induction includes a command to submit to induction. Though that command was formerly implied,[9] it is now express. The Selective Service Regulations state that it is the "duty" of a registrant who receives from his local board an order to report for induction "to appear at the place where his induction will be accomplished," "to obey the orders of the representatives of the armed forces while at the place where his induction will be accomplished," and "to submit to induction." § 633.21 (b). Thus it is clear that a refusal to submit to induction is a violation of the Act rather than a military order. The offense is complete before induction and while the selectee retains his civilian status. That circumstance throws light on the meaning of the words "actually inducted" as used in § 11 of the Act. Congress by accepting the Bone amendment to § 11 specified the maximum penalty to be imposed on those who violated the Act or disobeyed an order of their board prior to their induction.[10] It also withheld from military courts

---

[9] See §§ 633.1, 633.2, 633.6 in force in August, 1942.

[10] The Conference Report stated: "The Senate bill provided that persons subject to the bill who fail to report for duty as ordered should be tried exclusively in the district courts of the United States and not by military and naval courts martial, unless such persons had actually been inducted for the training and service prescribed in the bill or unless they were subject to trial by court martial under laws in force prior to the enactment of the bill. The House amendment in such cases gave the courts martial and the district courts concurrent jurisdiction, and made failure of persons to report for duty subject to the

jurisdiction over those offenders. At the same time, Congress did not authorize the Army to search out delinquents wherever they might be and induct them without more. We must therefore assume that Congress as a matter of policy decided that those who disobeyed the order of their board and refused to be inducted were to be punished by the civil authorities and by them alone.[11] If forcible seizure or detention of such offenders by the Army were sanctioned, the Congressional policy of providing the maximum punishment for their delinquency would be undermined.

Moreover, it should be remembered that he who reports at the induction station is following the procedure outlined in the *Falbo* case for the exhaustion of his administrative remedies. Unless he follows that procedure he may not challenge the legality of his classification in the courts. But we can hardly say that he must report to the military in order to exhaust his administrative remedies and then say that if he does so report he may be forcibly inducted against his will. That would indeed make a trap of the *Falbo* case by subjecting those who reported

---

laws and regulations concerning that branch of the land and naval forces to which they were assigned from the date they were required by the terms of the order to obey the same, even though they had not actually been inducted.

"The conference agreement contains the provisions of the Senate bill in this respect." 86 Cong. Rec. 12039.

[11] It is true that for other purposes Congress has treated selectees who are ordered to report for induction the same as those in military service. Thus the benefits of the Soldiers' and Sailors' Civil Relief Act of 1940 (50 U. S. C. App. § 501, 54 Stat. 1178), which originally obtained only to "persons in the military service," were extended by an Act of October 6, 1942, to selectees from the date of receiving an order to report until the time of actually reporting for induction. 50 U. S. C. App. Supp. II, § 516, 56 Stat. 770. But, as we have pointed out, the Selective Service Act and the regulations under it have not made the selectee's civilian status change to that of soldier at either point of time.

for completion of the Selective Service process to more severe penalties than those who stayed away in defiance of the board's order to report.

These considerations together indicate to us that a selectee becomes "actually inducted" within the meaning of § 11 of the Act when in obedience to the order of his board and after the Army has found him acceptable for service he undergoes whatever ceremony or requirements of admission the War Department has prescribed.

We are not concerned with the wisdom of either the "actually inducted" clause in § 11 or the procedure for selection and induction which has been prescribed under the Act. Nor is it for us to decide whether the maximum penalty provided by Congress is adequate for those who flout the Act while the nation fights for its very existence. But where Congress has drawn the line between civil and military jurisdiction it is our duty to respect it.

*Reversed.*

Mr. Justice Roberts is of the view that the judgment should be affirmed for the reasons stated in the opinion of the Circuit Court of Appeals, 135 F. 2d 505.

Mr. Justice Frankfurter:

Under the Selective Service Act of 1940, unlike that of 1917, a selectee is not subject to trial by a military court martial until he has been "actually inducted" for training and service. But Congress did not define when he was so "inducted." It thus left to judicial construction when the civilian status ceased and the military status began. In a matter of this sort, involving as it does the process of compulsory recruiting of the nation's Army in the midst of war, it is of vital importance that the line be drawn as definitely as the legislation reasonably permits in order that ambiguity and controversy be reduced to a minimum.

In the *Falbo* case we held the other day that "The connected series of steps into the national service which begins with registration with the local board does not end until the registrant is accepted by the army . . ." 320 U. S. 549, 553. The line that was thus drawn—when "the connected series of steps" has ended—seems to me to be the line to draw between the civil and military status of a registrant. In other words, when acceptance of a registrant is communicated by the Army, the Army has made its choice. The man is then in the Army. Such was the ruling, and I believe the correct ruling, of the court below. 135 F. 2d 505. According to the Court's opinion, as I understand it, the Act itself does not draw this line but Congress has authorized such a line to be drawn by appropriate regulations. On that assumption, I do not dissent.