Gerald J. SNELL, Plaintiff-Appellee,

v.

MAPLETON PUBLIC SCHOOL DIS-
TRICT NO. 7, a public corporation,
et al., Defendants-Appellants.

Civ. No. 9015.

Supreme Court of North Dakota.

Oct. 31, 1974.

Daniel J. Chapman, Bismarck, for plaintiff-appellee.

Conmy, Feste & Bossart, Ltd., Fargo, for defendants-appellants.

ERICKSTAD, Chief Justice.

Mapleton Public School District No. 7 and the members of its school board appeal to this court from a judgment rendered in favor of the plaintiff, Gerald J. Snell.

The pertinent part of the judgment reads:

"IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

"I.

"That the Plaintiff was an employee of a state political subdivision, within the meaning of Sections 37–01–25 and 37–01–25.1 of the North Dakota Century Code, and as such employee he was called into the federal non-civilian service.

"II.

"That the Plaintiff entered such non-civilian employment status for a period of two days and that thereafter he was discharged from said military service, within the meaning of the statute.

"III.

"That by the terms of Section 37–01–25.1, the Plaintiff was entitled to be rehired to his former employment with the state political subdivision.

"IV.

"That the Defendant school board was under the obligation to rehire the Plaintiff for the school year 1971–72 and the failure of the school board to rehire the Plaintiff is a violation of the Plaintiff's rights as set forth in Sections 37–01–25 and 37–01–25.1 of the North Dakota Century Code.

"V.

"That the total prospective wages for the Plaintiff were $7,050.00 and that the Plaintiff earned during said period $2,813.47 and the Plaintiff is therefore entitled to a judgment in the amount of $4,236.53 with interest at the statutory rate, together with the costs and disbursements taxed and allowed in the amount of $68.69, making a total Judgment of $4,305.22."

Prior to his employment as a business education teacher and football coach at Mapleton High School, Snell attended Mayville State College where he was a member of the football team. In one of the last games in his senior year, he sustained a knee injury which necessitated surgery in January of 1970 at St. John's Hospital in Fargo. The surgery was performed by Dr. Ross Halliday.

It appears that in May of 1970 Mr. Snell received his degree from Mayville State College and was ordered to take his first preinduction armed forces physical. He had previously, on March 20, 1970, signed a contract with the Mapleton School District for the 1970–71 school year.

Upon taking his first preinduction physical, Snell was informed that he had passed the physical but that he would be required to take another physical before being inducted into the armed services.

Because he had signed a contract to teach school at the Mapleton High School during the 1970–71 school year, he asked the Pembina County Draft Board at Cavalier to defer his induction until the end of the school year. In this effort to secure a deferment, he received the support of the superintendent of the Mapleton School District, Mr. Robert Kummeth, who wrote a letter to the board asking for Snell's deferment.

As a result of this effort when Snell received by order dated November 16, 1970, instructions to report to the selective service office at Cavalier, North Dakota, on December 14, 1970, he received in the same envelope an order of the same date postponing his induction to June 15, 1971.

Because of that order, notwithstanding Snell's very successful year as a coach of the Mapleton football team, which had a win-loss record of 8 to 0, and because all concerned believed that Snell would be inducted in June of 1971, no contract was entered into between the parties for the school year 1971–72.

Snell must have received an additional postponement of the induction for a few days. In any case, on June 23, 1971, after reporting to the draft board at Cavalier, he was appointed by the executive secretary of the board as the leader of a group of registrants to see that he and one other registrant reported to the Armed Forces Examining or Induction Station at Fargo.

Before taking the second physical he secured a statement from Dr. Halliday, the legible parts of which read:

"This 21 year old male was playing football last fall and was clipped from behind in the right knee. He was unable to play for one week but was able to do so after that. One week previous to examination he was running and demonstrating gym classes and his right knee suddenly gave way on him when he tried to stop suddenly. This was locked and he was unable to extend his knee completely. The next morning surgery was performed and a completely torn medial _____ was restored. Post-operatively his course has been unremarkable except that he's had two more episodes of his knee going out on him."

Snell gave this statement to the induction officials at the time he reported in June of 1971.

On arriving at the induction station at Fargo, Snell again underwent a physical examination and at that time his knee was examined by Dr. William Kelly, a specialist. At the conclusion of Dr. Kelly's examination, Snell was informed by the officials that he was physically not acceptable and was given a written statement to that effect. The form of the certificate so informing him of this fact is entitled "Statement of Acceptability." The pertinent part of that form which was checked by the officials as applying to his case reads: "Found not acceptable for induction under current standards."

The school district contends that since Snell was not under contract with the school district at the time that he reported

for induction in June of 1971 and was never actually inducted into the service; therefore he was never discharged from the service, and, accordingly, was not entitled to reemployment by the school district under the laws of North Dakota.

Pertinent to this issue are parts of Section 37–01–25, N.D.C.C., and Section 37–01–25.1, N.D.C.C.

"37–01–25. Officers and employees of state or political subdivisions in national guard or federal service to retain status for period of active service.—All officers and employees of this state or of a political subdivision thereof who:

 *  *  *  *  *  *

"3. Shall be subject to call in the federal service by the president of the United States;  *  *  *,

 *  *  *  *  *  *

·when ordered by proper authority to active noncivilian employment, shall be entitled to a leave of absence from such civil service for the period of such active service without loss of status or efficiency rating. If such persons have been in the continuous employ of the state or political subdivision for ninety days immediately preceding the leave of absence, the first thirty days of such leave of absence shall be without loss of pay."

"37–01–25.1. Reinstatement to former position—Appeals.—Any person referred to in section 37–01–25, who within ninety days after receiving a discharge other than dishonorable from such active noncivilian service, and who is not physically or otherwise incapacitated to perform the duties of the position formerly held by him, applies for such position held by him at the time of entering such active service, shall be given such position or one of like seniority, status, and pay, and shall be immune to discharge from said position except for cause, as defined by the department of veterans' affairs, for a period of one year after entering upon the duties of his civilian position. Any such person not so re-employed or who is discharged within a period of one year without cause, shall have the right of appeal to the department of veterans' affairs under such rules and regulations as the administrative committee on veterans' affairs may promulgate.  *  *  * "

On the day that Snell was informed that he was found nonacceptable, he so informed the superintendent of the Mapleton School District and told him he would be interested in refilling the position at Mapleton. Within approximately a month thereafter, in a letter to the president of the school board, he similarly informed the school board and demanded reinstatement.

■ The first argument, that Snell is not protected by Section 37–01–25, N.D.C.C., because he was not an employee of the Mapleton School District on June 23, 1971, when he reported to the draft board at Cavalier, North Dakota, for active noncivilian employment, is a highly technical one. We believe it to be without merit.

The notice to report was received in December 1970 when he was employed by the school district, notwithstanding that the deferment order permitted him until June of 1971 to actually report for induction. There is nothing in the record to indicate that he would not have been reemployed had he not been so ordered to report for induction. From a practical standpoint it was the order to report for induction that prevented him from being reemployed in the new school year.

It is urged, because Snell did not inform the school board of his knee problem and of the possibility. that he might therefore not be drafted because of it, that he should not now be able to assert his right to reinstatement as an employee. Although it might have been better had he so informed the board, we do not think the failure to so inform the board was a significant factor in this case, nor do we think that it should deprive him of his right to reinstatement if he was otherwise entitled to reinstatement as an employee.

The second argument made by the school board is that one must be actually inducted into the military service before one can be discharged from active military service.

Here, the school district refers us to Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305 (1944); and Billings v. Truesdell, 321 U.S. 542, 64 S.Ct. 737, 88 L.Ed. 917, 150 A.L.R. 1422 (1944), involving the issues of when and how induction into the armed forces is actually accomplished.

We think the citations are of little help as our statute does not refer specifically to induction. Our statute applies when a person subject to call in the federal service by the President of the United States is ordered by proper authority to active noncivilian employment.

It appears that he was ordered to active noncivilian employment by proper authority, to wit, the draft board, and that it was this order that precipitated his loss of employment in the new school year.

The third argument of the school board is that Snell was not discharged from active noncivilian service within the meaning of Section 37–01–25.1, N.D.C.C.

In support of its contention that the discharge contemplated by that section of the code must be something other than a statement of unacceptability for military service, the board refers us to Quam v. City of Fargo, 77 N.D. 333, 43 N.W.2d 292, 296 (1950):

"The plaintiff returned from his service in the army with a certificate of 'honorable service.' The statute uses the term, 'honorable discharge.' The only difference in the two terms is that the latter implies a separation from the armed services while the former does not necessarily do so. The intent of both is that the service in the military forces shall have been honorable in order that the person be entitled to the privileges accorded by the statute and the ordinance. The plaintiff's service qualified him under that provision of the statute. In the case of

Dierkes v. City of Los Angeles, 25 Cal.2d 938, 156 P.2d 741, 742, it is held: 'The words "honorably discharged," as used in Los Angeles charter provision for war service credit in computation of service required of policeman before retirement, means honorably relieved, released, transferred or retired from active duty status by military or naval authorities.' "

More pertinent, we believe, is what this court said in that case to the effect that statutes like this one, which protect the civil rights of public employees, should be liberally construed.

In Quam this court quoted with approval from a California decision:

"In Gibson v. City of San Diego, 25 Cal.2d 930, 156 P.2d 737, 740, it is said: '*Laws protecting the civil rights of public employees who enter the armed forces in time of war or emergency are favored. National, state, and municipal legislative bodies, and the people themselves by direct vote, have been alert to meet the need for special protective and encouraging measures. In a like progressive spirit both federal and state courts "have kept pace and have evinced a firm intention to take a liberal view" of these enactments "in order that their protective purposes may be fulfilled without undue imposition of constitutional limitations or hindrance through narrow judicial construction".* * * * We are bound by accepted rules of construction to consider the obvious purposes and objects sought to be attained by their adoption and to construe the language used, insofar as it reasonably permits, to the end of giving it vitality and efficacy in the accomplishment of such purposes and objects and fairness in its applications." [Emphasis added.]

We think it consistent with the approach applied in Quam to construe the term "discharge" in Section 37–01–25.1 to be satisfied by the notice of nonacceptability which Snell received in the instant case, inasmuch as it was the order to report for

induction that precipitated his loss of employment with the school board for the new school year.

■ The fourth argument made by the school board is that Snell is guilty of laches and thus ineligible for reinstatement under Section 37–01–25.1, N.D.C.C., in that he failed to notify the school board of the possibility that he might be found not qualified for induction as his notice of November 16, 1970, encouraged him to do.

The pertinent part of that notice reads:

"You may be found not qualified for induction. Keep this in mind in arranging your affairs, to prevent any undue hardship if you are not inducted. If employed, inform your employer of this possibility. Your employer can then be prepared to continue your employment if you are not inducted. To protect your right to return to your job if you are not inducted, you must report for work as soon as possible after the completion of your induction examination. You may jeopardize your reemployment rights if you do not report for work at the beginning of your next regularly scheduled working period after you have returned to your place of employment."

In light of the fact that Snell had been found acceptable in his first preinduction physical in May of 1970 and as far as the record indicates, there had been little change in the condition of his knee thereafter, it does not appear that there was a compelling reason why Snell should have specifically informed his employer of the fact that he would be required to have another physical at the time of the induction. We believe also that the school board had the responsibility of knowing and understanding the facts of life, to wit, that some people are rejected for physical reasons from military service and that the standards of acceptance vary according to the need of the military for draftees.

We therefore believe that Snell's conduct in this regard should not deprive him of his rights under Sections 37–01–25 and 37–01–25.1, N.D.C.C.

We think the reasoning by which the trial court reached its conclusion is deserving of our approval. We quote from the memorandum decision:

"Statutes must be construed with reference to the policy intended to be accomplished. Ulrich v. Amerada Petroleum Corporation, 66 N.W.2d 397 (N.D.1954). That construction which tends most fully to promote the object of a statute is favored. Austinson v. Kilpatrick, 82 N.W.2d 388 (N.D.1957).

"The policy objectives of Section 37–01–25.1 are plain. It is designed to guarantee a continuation of the careers of public servants who are temporarily needed in the service of their country. It shields employees from the inequities and penalties which career disrupting military service would otherwise cause. Such objectives are certainly wholesome and laudable.

"Was the career of the plaintiff disrupted by requirements of the Federal military? It is apparent from the evidence that it was. For months the prospect of a military interregnum in his career hung like a pall over the plaintiff. That ominous expectation was the sole reason for his not continuing at Mapleton. It is undisputed that had it not been for the Induction Order of November 17, 1970, plaintiff would have been retained on the Mapleton teaching staff. He wished to continue. The school administration was entirely satisfied with his performance. Justly so. The football team he coached never knew defeat. Under his tutelage the team brought to Mapleton the distinction of a conference football championship.

"It is true plaintiff did not request a renewal of his teacher's contract. However, he cannot be faulted for this. Contract renewals are normally considered in April. At that time it appeared to everyone concerned that plaintiff would be in

service and not available for the next school year. And as pointed out by plaintiff's counsel, in view of the Order to report for induction, any effort on his part to renew his contract would have been seen as tinctured with bad faith.

"As it developed, plaintiff was under the direct control of the military apparatus of the Federal Government for only two days. However, the length of his role in non-civilian service is not a controlling feature. The significant fact is that pursuant to proper authority he did surrender unhampered civilian status. This submission to military control was sufficient to bring him within the statute's area of dominion.

"Defendant School Board believes that use of the word 'discharge' in Section 37–01–25.1 infers the necessity of induction into the military service. I do not believe the word should be confined to such a limited sense. Properly, the word 'discharge' as used in the statute means termination or release from the status of non-civilian employment. It should not be limited to mean a document known as a 'discharge' which is issued as evidence of termination of military service. When plaintiff was released after two days in non-civilian status, he was 'discharged' in the statutory sense."

For the reasons stated in this opinion, we affirm the judgment of the trial court.

KNUDSON, PAULSON, JOHNSON and VOGEL, JJ., concur.