**DODEZ v. UNITED STATES.**

No. 9947.

Circuit Court of Appeals, Sixth Circuit.

March 18, 1946.

Writ of Certiorari Granted May 6, 1946.

See 66 S.Ct. 1017.

Victor F. Schmidt, of Rossmoyne, Ohio, for appellant.

Francis X. Feighan, of Cleveland, Ohio (Don C. Miller, of Cleveland, Ohio, on the brief), for appellee.

Before HICKS and SIMONS, Circuit Judges, and PICARD, District Judge.

PICARD, District Judge.

Appellant, member of Jehovah's Witnesses, was convicted by a jury in the District Court for the Northern District of Ohio, for violation of the Selective Training and Service Act of 1940, as amended, 50 U.S. C.A.Appendix, § 301 et seq., and regulations pursuant thereto. He failed to report for work of national importance and was sentenced to five years' imprisonment.

The issues are three, though under numerous headings, and cover questions that have heretofore been settled by our courts in many instances since administrators of the Act and members of this particular religious sect have clashed during the past five years in prolific litigation.

Appellant first claims—that the Selective Training and Service Act, as amended, and regulations adopted, constitute a Bill of Attainder or ex post facto law contrary to Clause 3, Section 9, Article I and the Sixth Amendment to the United States Constitution.

■■■ Our answer is in the negative.

In Cummings v. State of Missouri, 4 Wall. 277, at page 323, 71 U.S. 277, 18 L. Ed. 356, a Bill of Attainder is defined as "a legislative act which inflicts punishment without a judicial trial."

The Act and regulations, as they affect the status of an unwilling draftee who has become a member of the armed forces, do not by that test constitute a Bill of Attainder. The Act does not impose punishment without a judicial trial, even under decisions of our several courts, before Estep v. United States of America and Smith v. United States of America, 66 S.Ct. 423, were decided by our Supreme Court February 4, 1946, and which we will hereinafter discuss. As pointed out in Billings v. Truesdell, 321 United States 542, 64 S.Ct. 737, 88 L.Ed. 917; Smith v. United States, 4 Cir., 148 F.2d 288; Gibson v. United States, 8 Cir., 149 F.2d 751; United States v. Estep, 3 Cir., 150 F.2d 768; United States ex rel. Hull v. Stalter, 7 Cir., 151 F.2d 633, the writ of habeas corpus is available to protect rights of the individual after his induction into the service. The Constitution does not guarantee one the right to select his own tribunal or his own method of procedure. Emmons v. Smitt et al., D.C., 58 F.Supp. 869.

The recent case of United States v. Gosciniak, 7 Cir., 142 F.2d 240, likewise dealt with this phase of the Selective Training and Service Act, and other citations holding the Act constitutional are: United States v. Herling, 2 Cir., 120 F.2d 236, and United States v. Lambert, 3 Cir., 123 F.2d 395.

Defendant's second contention, that he had exhausted his administrative remedies so as to permit a judicial review of his classification as a defense to the indictment, calls for extended remarks in view of the recent opinions of the Supreme Court in Estep v. United States and Smith v. United States, supra.

Up to those decisions there had been a practically unbroken line of authorities holding that the administrative remedies of a draftee did not terminate until after he had been inducted into the service when he must resort to habeas corpus in order to question his classification. Sirski v. United States, 1 Cir., 145 F.2d 749; United States v. Flakowicz, 2 Cir., 146 F.2d 874; United States v. Estep, 3 Cir., 150 F.2d 768; Smith v. United States, 4 Cir., 148 F.2d 288; Koch v. United States, 4 Cir., 150 F.2d 762; Fletcher v. United States, 5 Cir., 129 F.2d 262; Klopp v. United States, 6 Cir., 148 F. 2d 659; United States v. Rinko, 7 Cir., 147 F.2d 1; Gibson v. United States, 8 Cir., 149 F.2d 751; United States v. Grieme (United States v. Sadlock), 3 Cir., 128 F.2d 811. See, contra, United States v. Peterson, D.C., 53 F.Supp. 760.

The final clarifying decision was that of Falbo v. United States, 320 U.S. 549, 64 S. Ct. 346, 88 L.Ed. 305, which did not involve the exact points of the Estep and Smith cases but which is on all fours with the case at bar. There Mr. Justice Black significantly and hitting the target squarely, on page 553 of 320 U.S., page 348 of 64 S.Ct., 88 L. Ed. 305, said: "Completion of the functions of the local boards and appellate agencies, important as are these functions, is not the end of the selective service process. The selectee may still be rejected at the induction center and the conscientious objector who is opposed to noncombatant duty may be rejected at the civilian public service camp. The connected series of steps into the national service which begins with registration

with the local board does not end until the registrant is accepted by the army, navy, or civilian public service camp. Thus a board order to report is no more than a necessary intermediate step in a united and continuous process designed to raise an army speedily and efficiently."

But as it can be anticipated that many deductions not intended by the Supreme Court will be drawn from the recent Estep and Smith cases it is imperative to determine what legal changes, if any, have been made by these decisions, and analyzing them we conclude that the majority opinion holds:

■ First, that registrant's administrative remedies are exhausted only when he presents himself at the induction center;

■ Second, if indicted for refusal to be inducted he may urge in his defense, that the draft board (a) had no jurisdiction; or (b) was prejudiced against him because, for example, his race, politics, or religion; or (c) failed to follow the machinery and procedure provided for in the draft act and regulations, such as not giving him a hearing or not permitting him to appeal; and

■ Third, that the courts may not set aside a classification honestly and fairly determined by the draft board no matter how "erroneous" that classification may be unless one of the above three defenses (a, b, or c) is clearly proven.

Let us check these conclusions.

Estep presented himself for induction but refused to be inducted and the record showed that he had been denied his right to make an effective appeal to the President. Smith also reported (or was forced to report) at the induction station and also refused to be inducted. The trial court had not permitted him to present proof that the draft board classified him 1–A without foundation, discriminated against him, and denied him the right to prove that he was a minister.

It was on these grounds that the majority opinion in the Estep and Smith cases found reasons to reverse the Court of Appeals. 4 Cir., 148 F.2d 288; 3 Cir., 150 F.2d 768. (Justices Douglas, Black, and Reed.)

But it is well also to note the three concurring, and one dissenting, opinions.

Mr. Justice Murphy concurred in the result restating in effect his reasons given in the Falbo case, supra, in which he had dissented, and insisting in his present opinion that in these types of cases habeas corpus is a meaningless illusory remedy at best. He questioned that every defendant would receive a fair hearing through habeas corpus after draftee was once inducted into the service, while Mr. Justice Rutledge, concurring in the result reached by the majority, ridicules the thought of courts "marching up the hill in the criminal case and down again in habeas corpus." [66 S.Ct. 432.]

Mr. Justice Frankfurter (in Part I), after reciting cogent and compelling reasons why classifications by draft boards are "final," Section 10(a) (2), 54 Stat. 885, 893, 50 U.S. C.App., § 310(a) (2), 50 U.S.C.A.Appendix § 310(a) (2), concurred in the result in the Estep case because Estep had been denied his right to appeal and in the Smith case because of the confused theory upon which defendant had been tried in the District Court.

The dissent by Mr. Justice Burton concurred in by Chief Justice Stone relies upon Part I of Mr. Justice Frankfurter's opinion and adheres to the rule that had been followed consistently by the several Circuit Courts of Appeals (Mr. Justice Frankfurter enumerates 40 Judges so holding from the first 8 circuits), to wit, that the registrant's remedy was habeas corpus and only after he has been actually inducted into the service.

■ So after reviewing Estep and Smith cases in detail and noting that no attempt is made therein to reverse Falbo v. United States, supra, we conclude that the Falbo and not the Estep and Smith decisions applies here. We believe the cases are identical since neither Falbo nor Dodez had exhausted his administrative remedies by reporting for induction. In the case at bar had draftee so reported and then refused to be inducted, the Estep and Smith decisions would have been controlling.

■ Defendant in his third claim insists that the draft board refused to grant him a fair hearing contrary to the due process provisions of the Fifth and Sixth Amendments to the Constitution of the United States and specifically contrary to provisions of the Selective Training and Service Act, as amended, and regulations. This point becomes important only if the Estep and Smith decisions can be interpreted as holding that such a defense may be raised at any point in draftee's journey and that it is not necessary for him to go through the formality of presenting himself at the

induction center when he is going to refuse to be inducted after he gets there.

In approaching this question we believe it advisable to record chronologically the events leading up to draftee's present status as outlined in the main by his segregated testimony when he was given carte blanche to explain his position.

Defendant registered with the Selective Service System on June 30, 1942, asserting that he was an ordained minister of Jehovah's Witnesses at Wooster, Wayne County, Ohio.

September 21, 1942, filed his questionnaire with the local board and attached thereto notice that on September 8, 1942, application had been made to add his name to the list of certified pioneers filed by the Society for National Headquarters. He asked also that he be classified IV–D (Minister of Religion) or that action be suspended until National Headquarters had ruled on such application.

September 26, 1942, asked exemption as a conscientious objector (IV–E) stating that he had been associated with the Watchtower Bible and Tract Society since 1941, filing extracts from the Bible, verification of his claim by his superiors, and several affidavits.

November 30, 1942, local board classified registrant 1–A for unlimited military service.

December 3, 1942, wrote asking a "personal hearing" and related that when he called at the board office, December 7, 1942, he was asked some questions by Mr. Hart, the secretary. He was then told the board would look over all his material "later tonight" and would hear him "later on."

December 8, 1942, received another 1–A classification.

He then made personal calls on individual board members, first contacting Mr. Cain who promised registrant another hearing and that he would "look over" registrant's file (R. 34).

Defendant then talked with board member Welty who also promised him a rehearing.

He then again visited Mr. Hart who had acted as secretary "the night of my hearing" (December 7) and "Mr. Hart's attitude had changed somewhat from his rush through attitude the night before at my hearing. It seemed as if he had lots of time now. After spending much time trying to explain to him that I was a minister and entitled to a IV–D classification, he insisted that one had to be a graduate from a Theological Seminary in order to be a minister and receive a IV–D classification" (R. 34).

Defendant then tried to see Mr. Weygandt, board chairman, who, over the telephone, promised him a personal hearing, but instead he received a letter from Mr. Weygandt, December 9, reading in part—

"I can see no justification for a further hearing. As explained to you, our state headquarters has asked that we limit all registrants to one personal appearance hearing, and after deliberating over your request, I can see no reason for making an exception in your case.

"You, of course, have a right to appeal the findings of the local board, and such an appeal must be filed within 10 days from the date given on your classification card" (R. 36).

Registrant claimed that this letter was an admission by Mr. Weygandt "that they were prejudiced in my case, and did not give me a fair hearing" (R. 37).

December 17, 1942, filed his application with the Board of Appeal.

January 21, 1943, was appointed a company servant and presiding minister of the Wooster, Ohio, Company of Jehovah's Witnesses and gave notice of this to the local draft board.

May 18, 1943, received a minister's license under the General Code of the State of Ohio.

June 11, 1943, six months after his 1–A classification, received a re-classification by the Appeal Board placing him in IV–E. He then wrote the government Appeal Agent asking him to use his influence to have his case reopened. (The IV–E classification is what appellant had asked for September 26, 1942, although he had also previously sought IV–D.)

Receiving this new classification he saw Mr. Wertz, the Appeal Agent, who told defendant he couldn't be classed as a minister because his name was not "on that certified list." Defendant concluded that Wertz was "highly prejudiced toward Jehovah's Witnesses" (R. 37).

Defendant later again asked for a hearing by the draft board but was told by one member (Cain) that he couldn't be classified IV–D because he was not on the "certified list."

He went to board member Arnold, who told him that the government and the board did not recognize Jehovah Witnesses "as ministers." Registrant concluded that Arnold was "very prejudiced to Jehovah Witnesses" (R. 39).

He then returned to Mr. Welty, and was told that the local board would reopen his case "only if new and sufficient evidence is presented." Although Mr. Welty went over his entire folder in his presence defendant concluded that Mr. Welty was "very prejudiced" (R. 40).

In December, 1943, defendant wrote the Appeal Board criticizing Mr. Weygandt for "his prejudice" but later saw Mr. Weygandt personally who talked with him for over an hour while defendant explained "Bible prophecy with present day events and he listened, although disagreeing on a few minor points" (R. 41).

Registrant admits that Mr. Weygandt said they would reopen his case or classify registrant as IV-D, "if National Headquarters requested it" but "due to the fact that my name was not on the certified list, he would not reopen my case or give me IV-D" (R. 41).

As late as June, 1943, he was informed by Mr. Cain "We talked this (his case) over the other night."

July 20, 1943, failed to report for final physical examination because his name was on appeal to National Headquarters.

November 8, 1943, filed more affidavits that he was a minister.

January 15, 1944, again asked to have his case reopened, sending the board what he claimed was additional evidence to show that he was a minister. This was refused.

February 28, 1944, received certificate of fitness.

March 17, 1944, asked permission to copy from his file a list of the letters contained therein and was refused.

April 18, 1944, sent notice to report for work "of national importance." For failure to comply with this order he was tried, convicted, and sentenced.

The record shows that defendant made little if any claim that he had not been given a hearing, fair or otherwise, in motions made prior to trial as counsel directed practically all attention to his theory that the draft law plus regulations, as interpreted by the courts, were in fact a Bill of Attainder. No stress was laid on the alleged prejudice of board members and no evidence of prejudice shown except defendant's questionable deductions.

In the 48 long instructions requested by defendant no claim is made that there had been no hearing and it can be noted that appellant through his counsel's brief, refers at times to the December 7 meeting as a "hearing" and at other times claims there had been "no hearing." The draft board consistently refers to appellant's demands as for a "further hearing" or "rehearing." It is only when the case reaches the Court of Appeals that stress is laid upon alleged failure to grant defendant "a hearing."

The record shows that from the time of defendant's registration to his final request for a rehearing 18 months had elapsed during which period he was almost continually arguing his case to individual board members. Reading the record it is clear to this court that the board had concluded that any further appearances by defendant would be a useless waste of time for three reasons:

First, registrant was offering only cumulative, not new or additional evidence;

Second, he could not be legally classed as an ordained minister under established practice because he did not meet requirements of the regulations; and

Third, his application for reclassification had been granted by the appeal board changing him from 1-A to IV-E following which he had presented no new evidence but merely additional affidavits.

From the above record it also appears that the District Court was very careful in seeking to preserve defendant's rights by permitting him to make many statements in the presence of the jury that under the accepted interpretations of the overwhelming weight of authority up to that point could have been ruled out. Then too the court more than once excused the jury and permitted defendant to make his own record and to place therein practically anything he wanted. A perusal of those statements freely made by defendant through his counsel emphasizes the fact that this defendant had many hearings. It also is a fair conclusion that no hearing or hearings would ever be considered fair by him unless the board classified him as a minister, although at one point defendant admitted—following persistent questioning—that every one of the 102 members of his own congregation held the same ministerial card that he carried. True he tries to make capital out of re-

642

marks of some board members claiming that these denoted prejudice and bias. But there is no evidence that that bias or prejudice, if any, entered into the board's conclusion.

Under the Estep and Smith decisions including the concurring opinion of Mr. Justice Frankfurter and the dissenting opinion, it is held that on this matter the classification of the board was final. As Mr. Justice Douglas states: "The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous."

Defendant will undoubtedly claim that the decision in his case was not "in conformity with the regulations" since the chronological history herein given, particularly the remarks attributed to Mr. Hart, board secretary, at the December 7 meeting prove that the board thought that to be classified as a minister under the regulations one had to be graduated from a theological seminary. At this time, according to the record, National Headquarters had instructed all draft boards that when a member of Jehovah's Witnesses sought exemption as a minister and his name was not on the so-called "certified official list," his status "must be determined in each individual case by the local board" because "It is impossible to make a general determination with respect to these persons as to their relationship to Jehovah's Witnesses."

Had draftee's name appeared on the official list he would have been classified as an ordained minister even by Mr. Hart. The record is clear that whether he had graduated from a theological seminary was not made the issue. His name not appearing on the certified list the board acted in a manner that it believed to be "in conformity with the regulations."

Affirmed.