## GIBSON *v.* UNITED STATES.

NO. 23.

Argued January 2, 3, 1946. Reargued October 23, 1946.—Decided December 23, 1946.

*Hayden C. Covington* argued the cause and filed briefs for petitioners. With him on a joint brief was *Victor F. Schmidt.*

*Irving S. Shapiro* argued the cause for the United States. With him on the briefs were *Solicitor General McGrath* and *Robert S. Erdahl. Walter J. Cummings, Jr.* was also on the brief on the original argument.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

These cases carry forward another step the sequence in decision represented by *Falbo, Billings, Estep* and *Smith.*[1] Each petitioner has been convicted for violating § 11 of the Selective Training and Service Act (54 Stat. 894, 50 U. S. C. App. § 311), Dodez for failing to report for work of national importance after being ordered to do so and Gibson for having unlawfully deserted the camp to which he had been assigned for such work.[2]

---

[1] *Falbo* v. *United States,* 320 U. S. 549; *Billings* v. *Truesdell,* 321 U. S. 542; *Estep* v. *United States,* 327 U. S. 114; *Smith* v. *United States, ibid.*

[2] Section 11 provides, in part: "Any person charged as herein provided with the duty of carrying out any of the provisions of this Act, or the rules or regulations made or directions given thereunder, who shall knowingly fail or neglect to perform such duty, . . . shall, upon conviction in the district court of the United States having jurisdiction thereof, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment . . . ."

Section 652.11 (a) of the regulations imposes the duty on persons classified IV–E to comply with the order to report for work of national importance; and by § 653.12 assignees are required to report to the camp to which they are assigned and to remain therein until released or transferred elsewhere by proper authority, except when on authorized missions or leave.

In each instance the conviction was sustained on appeal [3] and certiorari was granted because of the importance of the questions presented for the administration of the Act. No. 23, 326 U. S. 708, restored to the docket for reargument before a full bench; No. 86, 328 U. S. 828.

The principal issues relate to the time of completing the administrative selective process and the effect in each case of what was done in this respect upon the petitioner's right to make defense in the criminal proceedings on various grounds going to the validity of the classification.

In both cases tendered defenses of this character were excluded in the trial court and the exclusion was sustained on appeal. The effect was, in Gibson's case, to rule that although he had completed the administrative process by reporting to the camp, pursuant to the requirement of the *Falbo* decision, nevertheless his remedy, if any, on account of the alleged misclassification was by habeas corpus, not by defense in the criminal cause. 149 F. 2d 751. In Dodez' case it was held that by refusing to report for service at the camp he had failed to exhaust his administrative remedies and therefore under the *Falbo* doctrine he could not question his classification in the criminal suit. 154 F. 2d 637.[4]

## I.

Both petitioners are Jehovah's Witnesses. Each has claimed consistently since the time of his registration that he is a minister of religion and therefore exempt from

---

[3] 149 F. 2d 751 (C. C. A. 8); 154 F. 2d 637 (C. C. A. 6).

[4] Apparently in both cases the important changes in the applicable regulations made after the *Falbo* decision were not called to the attention of the trial courts or the Circuit Courts of Appeals.

training and service under the Act.[5] Each was denied this classification (IV–D), being classified instead as a conscientious objector (IV–E).[6] Administrative appeals were exhausted. Pursuant to the classifications given and the applicable statutory provisions and regulations, Dodez and Gibson were assigned to work of national importance and ordered to report for such work at designated camps.

Dodez refused to go to the camp. But Gibson, thinking the *Falbo* decision required him to report there in order to exhaust his administrative remedies, went to the camp, remained for five days, and then departed without leave. It is undisputed that he intended at no time to submit to the camp's jurisdiction or authority and that he at all times made this intent clear. Everything he did was done solely to make sure that the administrative process had been finished and with a view to avoiding the barrier Falbo encountered in his trial when he sought to question his classification.

Obviously the petitioners have sought to reach the same point, namely, the place at which the selective process is exhausted administratively, but have differed concerning its exact location. Dodez maintains that the point was reached, under the applicable regulations,[7] when his preinduction physical examination had been given and he was found acceptable for service by the Selective Serv-

---

[5] The exemption is provided by § 5 (d) of the Act, 54 Stat. 885, 888, as follows: "Regular or duly ordained ministers of religion, and students who are preparing for the ministry in theological or divinity schools recognized as such for more than one year prior to the date of enactment of this Act, shall be exempt from training and service (but not from registration) under this Act."

[6] Pursuant to § 5 (g) of the Act, which provides that persons so classified shall be assigned to noncombatant service or, if conscientiously opposed to this, then to "work of national importance under civilian direction."

[7] See text Part II *infra* at note 19; also note 13.

ice System.   This was on February 21, 1944, two months prior to the date (April 21, 1944) when he was ordered to report for work and refused to go.

On the other hand, Gibson argues that until the preliminaries to actual service, including physical examination, were completed at the camp, he was not foreclosed by going through with them from exercising his choice not to submit to the camp's jurisdiction, cf. *Billings* v. *Truesdell,* 321 U. S. 542, or, upon doing so, from asserting the invalidity of his classification in a criminal trial either for failing to report for service or for desertion from the camp. Cf. *Estep* v. *United States,* 327 U. S. 114; *Smith* v. *United States, ibid.*   Clearly, on the facts and the issues, the question as to Dodez, like that in Falbo's case, is whether he went far enough to exhaust the administrative process; while as to Gibson it is said that he went too far, that is, beyond the point of completing that process, and that this cut off the right of defense concededly available to him at that point.

## II.

If these cases were controlled in all respects by the regulations effective when Falbo's case was decided, Dodez would seem clearly to fall within the decision's proscription.   The Court there said: "Completion of the functions of the local boards and appellate agencies, important as are these functions, is not the end of the selective service process.   The selectee may still be rejected at the induction center and the conscientious objector who is opposed to noncombatant duty may be rejected at the civilian public service camp.   The connected series of steps into the national service which begins with registration with the local board does not end until the registrant is accepted by the army, navy, or civilian public service camp.   Thus a board order to report is no more than a necessary intermediate step in a united and continuous process designed to

raise an army speedily and efficiently." 320 U. S. at 553. Since acceptability for service was not finally determined under the regulations then applicable until the registrant had reached camp, had there undergone or waived the specified physical examinations, and thereupon had been found acceptable,[8] and since Falbo had not taken those steps, the Court held he was not entitled to question his classification and therefore sustained his conviction.

However, intermediate the *Falbo* decision and issuance of the order to Dodez to report, the regulations governing the procedure relating to selection for service were changed and in a manner which Dodez says relieved him from the necessity of going to the camp in order to complete the administrative process. The Government now concedes, we think properly,[9] that Dodez is right in this view.

It is not necessary to review in detail the regulations which were governing in Falbo's case, since they are

---

[8] At that time § 653.11 (c) of the Selective Service Regulations provided: "If the assignee indicates that his physical condition has changed since his final-type physical examination for registrants in Class IV–E, the camp physician shall examine him with reference thereto. If the assignee is not accepted for work of national importance, the Camp Director will indicate the reason therefor, and the assignee, pending instructions from the Director of Selective Service, will be retained in the camp or hospitalized where necessary." Cf. note 10.

This provision, effective by Amendment No. 40 on March 16, 1942 (7 F. R. 2093), was eliminated entirely by Amendment No. 210 (9 F. R. 1416), effective February 2, 1944, a little more than two months prior to the date specified for Dodez to report for work, namely, April 21, 1944; but was restored in modified form on June 7, 1944, by Amendment No. 236 (9 F. R. 6207), nearly two months before Gibson was ordered to report on August 21 of that year.

[9] A confession of error on the part of the United States "does not relieve this Court of the performance of the judicial function. The considered judgment of the law enforcement officers that reversible error has been committed is entitled to great weight, but our judicial obligations compel us to examine independently the errors confessed." *Young* v. *United States,* 315 U. S. 257, 258–259.

not controlling in either of the present ones. Although it is now argued that the Court misconceived their effect,[10] we need only to note that it was within the registrant's power to secure a physical examination by the camp physician by indicating a change in his physical condition, it could not be known in advance in any case whether he would demand it, and until this was determined it could not be known finally and irrevocably whether he would be "accepted for work of national importance." [11]   The decision therefore correctly ruled that "the conscientious objector who is opposed to noncombatant duty may be rejected at the civilian public service camp" and that the board's order to report there for service was "no more than a necessary intermediate step" in the continuous selective process, which was not ended until the last possibility for rejection had been exhausted.   Under those regulations there was no final and conclusive acceptance for service until after those procedures at the camp were completed.

It was exactly in this respect, however, that the changes made in the regulations immediately after the *Falbo* decision [12] and shortly prior to issuance of Dodez' order to

---

[10] The contention is that § 653.11 (c) of the regulations as it then stood, see note 8, provided for physical examination at the camp and possible rejection there only if the registrant on reporting indicated a change in his physical condition and that this was effective only as to persons sustaining such a change, not to others, of whom Falbo was one.   The argument assumes that the registrant's actual condition, not the possibility that a change might occur and be found in any case, was controlling not only to determine the outcome of the examination, but to foreclose the possibility that change might be "indicated" and, in that event, final determination of acceptability would be made after the examination.

[11] The regulation clearly contemplated that, upon receipt of such instructions from the Director of Selective Service, the registrant might be rejected or released.

[12] The decision was rendered January 3, 1944.   The basic changes in the regulations were made January 10, 1944.   See text *infra* at notes 13–17.

report, together with still others made later but prior to the order to Gibson, were effective. The changes were extensive and important. The altered regulations are lengthy. We therefore give a summary in the margin, noting the more important differences between those applicable to Dodez and those in effect as to Gibson.[13]

It is of some importance to note that the changes affecting both registrants were made in consequence of the enactment of § 5 of Public Law 197, 78th Congress, approved December 5, 1943. 57 Stat. 596, 599, 50 U. S. C. App. § 304a. This required preinduction physical examinations to be given before the registrant was ordered to

---

[13] After a registrant has been classified IV–E he is given a preinduction physical examination. Reg. §§ 629.1, 629.2. If found acceptable for service he is issued a certificate of fitness. Reg. § 629.32. Thereafter the local board notifies the Director of Selective Service that the registrant is available for assignment to work of national importance, Reg. § 652.1, and such an assignment is sent to the local board. Upon receipt thereof, the local board issues to the registrant an order to report for work of national importance, commanding him to report at a designated time and place, Reg. § 652.11. When the registrant reports, transportation to a camp for work of national importance is furnished, Reg. § 652.12. Thereafter he "is under the jurisdiction of the camp to which he is assigned." The local board then can take no further steps with regard to such registrant without instructions from the Director of Selective Service, but should report any information to the Director of Selective Service which might affect the registrant's status, Reg. § 652.13.

Upon arrival at the camp the registrant (now called assignee in the regulations) is given a physical examination, although at the time the case of Dodez arose specific provision for such an examination was not made in the regulations. See note 8. It was merely provided that "the camp director shall, on the bottom of page 4 of the Original and First Copy of the Report of Physical Examination and Induction (Form 221), place a statement that a registrant is accepted for work of national importance at the civilian public service camp to which the registrant has been assigned." Reg. § 653.11 (b). However, this regulation subsequently was amended in the form applicable to the case of Gibson. See note 28 *infra*.

report for induction and service.[14]  Previously he first had been ordered to report for induction, was then given his preinduction examination by the armed forces and, on being found acceptable, was inducted at once.[15]  The major changes in the regulations giving effect to § 5 were made on January 10, 1944, one week after the *Falbo* decision came down, some taking effect on that date,[16] others on February 2d following.  These applied to Dodez.  Still others not applicable to him but operative as to Gibson took effect on June 7, 1944.[17]

The changed regulations, following out the command of § 5 of Public Act 197, provided for a preinduction physical examination to be given before issuance of the order to report for induction, rather than afterward.  Section 629.1 of Amendment No. 200 (9 F. R. 440–442), effective January 10, 1944.[18]  This was the basic amendment.  It applied to all registrants subject to call for service, includ-

---

[14] The statute, in so far as is now material, provided: "Any registrant within the categories herein defined when it appears that his induction will shortly occur shall, upon request, be ordered by his local board in accordance with schedules authorized by the Secretary of War, the Secretary of the Navy, and the Director of Selective Service, to any regularly established induction station for a preinduction physical examination, subject to reexaminations.

"The commanding officer of such induction station where such physical examination is conducted under this provision shall issue to the registrant a certificate showing his physical fitness or lack thereof, and this examination shall be accepted by the local board, subject to periodic reexamination.  Those registrants who are classified as I–A at the time of such physical examination and who are found physically qualified for military service as a result thereof, shall remain so classified and report for induction in regular order."

[15] Compare the procedure outlined in *Billings* v. *Truesdell*, 321. U. S. 542.

[16] See notes 18, 19, *infra*, and text for the principal changes.

[17] These are noted specifically *infra* at note 28 and text.

[18] Pertinently the basic regulation provided: "Every registrant, before he is ordered to report for induction, shall be given a pre-induc-

ing those classified IV–E. Moreover, by Amendment No. 210 (9 F. R. 1416), effective February 2, 1944, § 653.11 of the regulations applicable to men so classified was changed to eliminate the previously effective paragraph (c) providing for physical examination by the camp physician on indication of changed condition and consequent possible rejection at the camp. Instead the amended regulation stated simply that (a), when the "assignee" had reported to the camp, the camp director should *"complete the Order to Report* for Work of National Importance (Form 50)"; and (b) place, as specified, on the assignee's papers, "a statement that [the] registrant *is accepted"* for work at the designated camp, stating also the date and place of acceptance; (c) the local board, "upon receiving notice that a registrant *has been accepted for work,"* should not "change his classification but shall note the fact *of his acceptance"* on Form 100; and (d), if the assignee failed to report when required, the camp director was to notify the Director of Selective Service.[19] (Emphasis added.)

tion physical examination under the provisions of this part unless (1) he signs a Request for Immediate Induction (Form 219) or (2) he is a delinquent. . . ."

[19] Because § 653.11 as changed by Amendment No. 210 is crucial in Dodez' case, the exact language is quoted: "(a) When the assignee has reported to camp, the camp director *shall complete the Order to Report* for Work of National Importance (Form 50). Four copies of the completed Order to Report for Work of National Importance (Form 50) shall be sent to the Director of Selective Service; one copy will be retained by the camp director. The Director of Selective Service will forward two copies of the Order to Report for Work of National Importance (Form 50) to the appropriate State Director of Selective Service, who will retain one copy for his files and mail the other copy to the local board for filing in the registrant's Cover Sheet (Form 53).

"(b) *The camp director shall,* on the bottom of page 4 of the Original and First Copy of the Report of Physical Examination and

The effect of the statute and the amended regulation was to place the order to report for service nearer the end of the administrative process than it had been previously, so far as concerned the power of the registrant to take action which might result in his rejection. The elimination of the provision permitting medical examination at the camp, by Amendment No. 210, removed any chance the registrant formerly had to secure rejection by demanding examination there, and left to be performed at the camp only the formal entries of "completing the Order to Report" and noting the fact, time and place of "acceptance" upon the assignee's papers, together with the duties of notifying the local board of acceptance or the Director of Selective Service of failure to report.

Although the amended regulations thus speak of "completing the Order to Report" and of placing on his papers "a statement that a registrant is accepted," we agree that these were only formal matters to be performed by camp officials, and left nothing to be done by them or by the applicant after reaching the camp which might result in his being rejected or released from the duty to remain and perform the further duties imposed on him. To construe

Induction (Form 221), *place a statement that a registrant is accepted* for work of national importance at the civilian public service camp to which the registrant has been assigned. The statement *shall specify the date and place of such acceptance* and shall be signed by the camp director who shall retain the First Copy of the Report of Physical Examination and Induction (Form 221) and shall forward the Original to the Director of Selective Service.

"(c) Upon receiving notice that a registrant *has been accepted* for work of national importance, the local board shall not change his classification *but shall note the fact of his acceptance* for such work in the Classification Record (Form 100).

"(d) In the event an assignee does not report to the camp at the time prescribed in his Order to Report for Work of National Importance (Form 50) or pursuant to the instructions of the local board, the camp director will report such fact to the Director of Selective Service." (Emphasis added.)

the regulations otherwise would be to force the registrant not only to perform all requirements affording possibility of relief but also to go through with purely formal steps to be taken by camp officials offering no such possibility. Exacting this would stretch the requirement of exhausting the administrative process beyond any reason supporting it. Cf. *Levers* v. *Anderson,* 326 U. S. 219. And, as appears from Gibson's experience, by going through with those formalities Dodez would have found himself confronted with the Government's contention that he had gone too far.

We hold therefore, in accordance with Dodez' view and the Government's concession, that he was not required to report to the camp, under the regulations effective when his order to report became operative, in order to complete the administrative process; and that he therefore was not foreclosed by the *Falbo* decision from making any defense open to him in his criminal trial under the statute or the Constitution aside from the effect of that decision. *Estep* v. *United States,* 327 U. S. 114; *Smith* v. *United States, ibid.;* cf. *Billings* v. *Truesdell,* 321 U. S. 542.

This view requires reversal of the judgment in No. 86 and remanding the cause to the District Court for a further trial. Dodez insists however that we should go further and determine the case finally upon the merits. He urges that the evidence properly tendered and admissible upon the excluded defenses, as well as that adduced,[20] would support no other verdict than one of acquittal and that therefore the trial court should have sustained his motion to dismiss the cause.[21] Accordingly

---

[20] The trial court permitted Dodez to introduce *de novo* evidence intended to show that as of the time of the trial he was a minister. But the court, over objection, declined to allow this evidence to go to the jury.

[21] The question was also raised by motion for a directed verdict, which was overruled.

he asks for a judgment here directing that such relief be given.

In the *Estep* and *Smith* cases, after holding that the petitioners had been wrongfully denied opportunity to defend by attacking the validity of their classifications, this Court reversed the convictions and remanded the causes for new trials, stating: "We express no opinion on the merits of the defenses which were tendered. Since the petitioners were denied the opportunity to show that their local boards exceeded their jurisdiction, a new trial must be had in each case." 327 U.S. at 125. Dodez' situation is identical, in this respect, with those of Estep and Smith.[22] Accordingly we remand the cause, as was done in the *Smith* and *Estep* cases, for further proceedings in the trial court, without expressing opinion upon those further issues.

### III.

The Government urges that the conclusion we have accepted for Dodez forces the contrary result in Gibson's case No. 23. The argument, as we have pointed out, is

---

[22] In each case the tendered defenses were substantially two, namely, (1) that a full and fair hearing had been denied in the selective service proceedings, particularly before the local board; and (2) that the undisputed evidence would sustain no other conclusion than that the registrant was a minister of religion. In each case also evidence was tendered and excluded in the trial court to sustain the first of these defenses. Appropriate determination of that defense would require not only reception and consideration of evidence properly tendered upon the issue, but also in consequence thereof determination of issues of fact, including credibility and inferential conclusions, properly to be made in the trial court rather than by an appellate tribunal. Since issues of credibility also may be involved in determining whether the evidence would support no other conclusion than that the registrant was a minister, that question too is more appropriately determinable in the first instance in the trial court. Moreover, it is not certain that another trial will be had or that the identical issues will be presented if one is held.

352

not that Gibson fell short of exhausting the administrative process, for he clearly had done this. It is rather that he went beyond what was required for that purpose, thereby became subject to the camp's jurisdiction, and in doing this irrevocably foreclosed himself from defending against the charge of desertion on the ground that his classification was invalid.

The Government's position is founded upon analogy to the cases which hold that one who has been inducted into the armed forces, although wrongfully, becomes subject to military jurisdiction, is thereafter amenable to its processes,[23] and can secure his release from service or military custody only by resort to habeas corpus.[24]

Applying the analogy, the Government insists that when Gibson went to the camp and there went through the preliminary formalities for becoming a member, he became "inducted" as a camp member, just as one becomes a member of the armed forces by undergoing the induction ceremony, cf. *Billings* v. *Truesdell, supra,* even though the induction is in violation of his rights. Thereafter, the argument continues, Gibson became subject to the camp's "jurisdiction," just as the wrongfully inducted soldier would become subject to military jurisdiction; and, like the latter, cannot raise the illegality of his induction as a defense to a charge of violating any duty imposed upon inducted members; but must seek his relief, if any, by the

---

[23] See, e. g., *In re Morrissey,* 137 U. S. 157; *In re Miller,* 114 F. 838; *United States* v. *Reaves,* 126 F. 127; *In re Carver,* 142 F. 623; *In re Scott,* 144 F. 79; *Moore* v. *United States,* 159 F. 701; *Dillingham* v. *Booker,* 163 F. 696; *United States ex rel. Laikund* v. *Williford,* 220 F. 291; *Ex parte Romano,* 251 F. 762; *Ex parte Tinkoff,* 254 F. 912; *Ex parte Kerekes,* 274 F. 870. But cf. *Ver Mehren* v. *Sirmyer,* 36 F. 2d 876; *Ex parte Beck,* 245 F. 967. Cf. *Kurtz* v. *Moffitt,* 115 U. S. 487.

[24] See *In re Grimley,* 137 U. S. 147; *Stingle's Case,* Fed. Cas. No. 13,458; *United States ex rel. Turner* v. *Wright,* Fed. Cas. No. 16,778. See also cases cited in note 23.

writ of habeas corpus. Since the Act and the regulations laid upon camp members a duty to remain and perform the further duties prescribed for them,[25] Gibson's departure without leave amounted to desertion; his defense of wrongful classification is no more open to him than a defense of illegal induction would be open to a wrongfully inducted soldier violating a military order; and his remedy, if any, is to apply for release from the camp through habeas corpus.

The argument is supported by extensive reference to the regulations in force when Gibson was ordered to report, including the changes affecting Dodez and the others which became effective June 7, 1944, by Amendment No. 236 (9 F. R. 6207). The important changes this amendment made were two, namely: (1) to reintroduce into § 653.11 the provision applicable in Falbo's case but eliminated as to Dodez by Amendment No. 210, effective February 2, 1944,[26] for medical examinations to be given at the camp to determine change in condition; and (2) to add to the preexisting requirement for the camp director's noting the fact of acceptance on the registrant's papers [27] the explicit new provision that this should be done "irrespective of the determination which is made as a result of the examination." [28]

---

[25] See note 2.

[26] See text at notes 18, 19. Under § 653.11, as reintroduced, the physical examination at the camp was given to all "assignees," regardless of whether they indicated a change in physical condition. Cf. note 8.

[27] Cf. note 19, § 653.11 (b).

[28] The alterations made in § 653.11 by Amendment No. 236 will appear from comparing the text of the section prior to the amendment, see note 19, with the following quoted portions, following the amendment:

"(b) As soon as possible after the assignee has reported to camp, the camp physician *shall give him a physical examination and shall*

354

The Government also emphasizes two other regulations. One is § 652.12, requiring the local board to provide transportation for registrants reporting to it for transportation to the camp. The other, § 652.13, providing that a Class IV–E registrant *"after he has left the local board in accordance with § 652.12* for work of national importance under civilian direction *is under the jurisdiction of the camp* to which he is assigned." [29]  (Emphasis added.)

*determine whether there has been any change in the assignee's physical or mental condition* since his preinduction physical examination. If a camp physician is not available, the camp director, to the extent that he is capable of doing so, shall, by observing and questioning the assignee, make such determination. The camp physician or the camp director, as the case may be, shall, on the bottom of page 4 of the original and first copy of the Report of Physical Examination and Induction (Form 221), make a record of such determination.

"(c) *Irrespective of the determination which is made as a result of the examination of an assignee made under the provisions of paragraph (b)* of this section, the camp director *shall,* on the bottom of page 4 of the original and first copy of the Report of Physical Examination and Induction (Form 221), *place a statement* that a registrant *is accepted* for work of national importance at the civilian public service camp to which the registrant has been assigned. The statement *shall specify the date and place of such acceptance* and shall be signed by the camp director who shall retain the first copy of the Report of Physical Examination and Induction (Form 221) and shall forward the original to the Director of Selective Service." (Emphasis added.)

The reintroduced provision of § 653.11 became subsection (b) of the amended section and the former subsection (b) became subsection (c) with the added initial provision, "Irrespective of the determination . . . ," etc.

[29] The regulation, § 652.13, reads as follows: "A registrant in Class IV–E who has reported for work of national importance pursuant to this part shall be retained in Class IV–E by the local board. *Such registrant after he has left the local board in accordance with § 652.12 for work of national importance under . civilian direction is under the jurisdiction of the camp to which he is assigned.* The local board shall take no further steps with regard to such registrant without instructions from the Director of Selective Service, but should report

The short effect of § 653.11, as altered at the time of Gibson's order to report, was to retain the requirements for formal entries of "acceptance" and giving notice, at the camp, which applied to Dodez; to reintroduce the provision for physical examination there; but at the same time to nullify the possibility this presented in Falbo's case for giving relief, by providing that the camp director should note the fact of acceptance "irrespective of the determination which is made as the result of" this examination.

Taking account of revised § 653.11 as precluding any possibility for securing administrative relief at the camp, the Government regards § 652.13 as marking the precise and crucial line for crossing from the board's jurisdiction into that of the camp, namely, at the point where the registrant begins his journey to the camp. To take this step, it says, is equivalent to the oath in the induction ceremony prescribed for men entering the armed forces, cf. *Billings* v. *Truesdell, supra;* and produces the same consequences for foreclosing the defense of illegal classification, regardless of intention to submit to the camp's jurisdiction, indeed in spite of Gibson's unwavering manifestation of intention not to submit.[30]

Much of the argument was devoted to whether, on the basis of the Government's analogy, § 652.13 could be

any information to the Director of Selective Service which might affect the registrant's status." (Emphasis added.) 7 F. R. 112.

Section 652.13 was adopted December 24, 1941, became effective February 1, 1942, and therefore was in effect as to Falbo as well as to Estep, Smith, Dodez and Gibson.

[30] The Government does not urge that Gibson waived his rights by submitting to "induction," in the sense of voluntarily surrendering them; it is rather that he acted at his peril in taking steps beyond those required to complete the administrative remedial process, even though he mistakenly thought them necessary for that purpose. The argument is essentially one of forfeiture rather than of waiver. The facts would sustain no implication of intention to submit to "induction" or to surrender any rights.

taken to fix the end of the "interval of choice," cf. *Billings* v. *Truesdell, supra,* in view of the constantly changing character of the regulations, the absence of any prescribed induction ceremony such as the *Billings* case involved, and the consequent difficulty confronting one seeking to comply with the *Falbo* decision in ascertaining the exact location of such a line.[31]   We do not find it necessary to consider the conflicting contentions in this respect, or therefore to scrutinize the regulations with a view to locating such a point.   More fundamental considerations are controlling.

We have said that the Government's argument is founded entirely upon analogy, because no case has ruled that one who becomes subject to the "jurisdiction" of a work camp under the Selective Service procedure thereby forfeits his right to defend against a charge of desertion or other breach of duty, on the ground that his classification was invalid.   Nor has it been held that his only recourse for release from the camp is by way of habeas corpus. Furthermore, we think there are compelling reasons why the analogy does not hold true.

---

[31] It is Gibson's position that had he not gone to the civilian public service camp and subjected himself to the physical examination given by the camp physician, see note 29, the courts might subsequently have held that in a prosecution under § 11 he was foreclosed by the *Falbo* doctrine from making the defense that his classification was illegal.   He says further that the regulations applicable to Falbo and those applicable to him were so similar that no reasonable person reading them could have determined that under the latter it was not necessary to undergo the physical examination given at the camp in order to complete the administrative process.   Indeed, he asserts that in some ways the later regulations were more compelling than those applicable to Falbo, since at the time Falbo was ordered to report the physical examination was required only for those who indicated a change in their physical condition, whereas when he was ordered to report all assignees were required to be given physical examinations.   Cf. notes 8, 26.

In the first place, there are obvious and important differences between the two situations which it is sought to connect by the claimed resemblance. Not the least is that in the one instance the person concerned crosses the vast gulf between civil and military jurisdiction, with all the attendant consequences for change in status and rights, whereas in the other no such chasm is traversed. The alleged transfer of "jurisdiction" is only from one civilian agency to another, both branches of the Selective Service System, and there is none at all from the authority of the civilian courts as agencies for the enforcement of obligations imposed by the law. There is in fact no change in "jurisdiction" whatsoever, except in the sense that from the time he becomes a camp member the registrant's duties are different and his orders come through different channels of the same agency.

Unlike the man "actually inducted," the person classified IV–E remains a civilian; his duties are not military in character; he is not subject to military discipline or authority; and for violation of duties or orders he cannot be tried by court martial or military tribunal. On the contrary, the Selective Service Act expressly provides the same civil penalties and mode of trial for violating duties arising when he enters the camp as for those arising before that time.[32]

There is therefore no such profound change in rights, duties and status as occurs when one crosses the line between civil and military jurisdiction by being "actually inducted" under the rule of *Billings* v. *Truesdell, supra.* It was this change and the consequences it entailed, together with the statute's command that no one should be tried by military or naval court martial in any case arising under the Act until he had been actually inducted,[33] which

[32] See § 11, note 2 *supra.*

[33] Section 11 of the Selective Training and Service Act reads in part: "No person shall be tried by any military or naval court martial in

we there held to require placing the line precisely, not only for exhausting administrative remedies under the *Falbo* rule, but also for marking the point of actual induction at which the registrant's right ends to choose between going forward into the service and incurring the civil liability for breach of that duty.

The person classified as conscientious objector is never confronted with that choice. He is relieved by the Act from any duty to perform military service. He is not threatened with induction. He is in fact farther removed from military status or jurisdiction after he is finally assigned to civilian public service of national importance, and for this reason is rejected for military service, than he was before that time. His choice is not between going into service and taking the civil penalty laid for violating that duty. It is between performing civilian service under civilian authority and incurring the civil penalty for refusing to do so.

Moreover, in the case of one entering the armed forces, the loss of civil rights, including those of recourse to the civil courts other than by way of habeas corpus,[34] results altogether by virtue of the change from civilian to military status. The reasons underlying those rulings do not apply in the case of one who does not undergo that change, remains at all times a civilian, subject only to civilian duties and to civil penalties for violating them. There is not the

---

any case arising under this Act unless such person has been actually inducted for the training and service prescribed under this Act or unless he is subject to trial by court martial under laws in force prior to the enactment of this Act." It was held in the *Billings* case that in view of the legislative history Congress could not be presumed "to have restored by the second 'unless' clause in § 11 what it took away by the first 'unless' clause." Section 11 rather indicated "a purpose to vest in the civil courts exclusive jurisdiction over all violations of the Act prior to actual induction." 321 U. S. at 547.

[34] See notes 23, 24, *supra,* and text.

same necessity or compulsion in such a case for bringing about forfeiture of civilian rights, including remedies for questioning the validity of the order the registrant is charged with violating. That compulsion arises from the necessity for preventing interruption of military processes by intrusion of the civil courts beyond the essential minimum of keeping open the habeas corpus channel to show that the military authority has exceeded its jurisdiction in dealing with the individual.[35]   It is on this foundation that the forfeiture of other civil remedies is held to take place.

But there is no such necessity, or therefore any such foundation for forfeiture, in the case of one classified as a conscientious objector and assigned for work of national importance.   Serious as are the consequences of his refusal to perform that work, dealing with such breaches of duty by the civil courts does not involve, in the remotest sense, interruption or interference by civilian authority with military processes or jurisdiction.   Entirely wanting therefore is any such foundation for forfeiture of civil rights as exists in the case of one inducted into the armed services.   Without such a foundation the analogy dissolves and with it the asserted forfeiture.

This becomes even more clear when it is recalled that one basis for the forfeiture, which the Government has maintained, is that habeas corpus is available for the person classified IV–E and wrongfully denied classification and exemption as a minister of religion.   This remedy, it was asserted originally, is adequate and exclusive, and therefore should be held to foreclose resort to other forms of relief.

But here again the asserted analogy fails.   It has been clearly established that the remedy by way of habeas corpus is open to the wrongfully inducted member of the

---

[35] *Ibid.*

armed forces to secure his release.[36]   But at the argument it was conceded that neither the camp director nor other officials of the Selective Service System are authorized to use force to arrest or restrain one who refuses to remain in the camp.   And this, it was also admitted, would make doubtful the availability of relief by way of habeas corpus.[37]   Indeed it might well be urged that the remedy is not available for one charged with violation of any duty, whether failure to report to the camp, to remain there, or to perform other obligations, since the only compulsion laid upon such a person by the Act or otherwise is the force of the legal command plus the provision for criminal penalty in case of disobedience.

We need not decide this question, however, and we express no opinion upon it.   For it is enough to destroy the analogy the Government seeks to draw that the remedy by habeas corpus is an uncertain one.   Should it be found unavailable and at the same time we should rule that petitioner's defense could not be made in the criminal proceeding, he would be left entirely without remedy, a result consistent neither with our decision in the cases of *Estep* and *Smith, supra,* nor with the statute.   No more, we think, is it consistent with the Act or those rulings to foreclose the right of defense upon the basis of uncertainty whether the habeas corpus remedy might be had.

Finally, Congress has provided expressly for enforcing the duty to report to the camp for work and duties arising thereafter through the criminal proceedings and penalties

---

[36] *Billings* v. *Truesdell,* 321 U. S. 542; and see the authorities cited in note 24, *supra.*

[37] Cf. *Wales* v. *Whitney,* 114 U. S. 564; *Stallings* v. *Splain,* 253 U. S. 339; *McNally* v. *Hill,* 293 U. S. 131, 137–138; *Weber* v. *Squier,* 315 U. S. 810; *Tornello* v. *Hudspeth,* 318 U. S. 792; *Zimmerman* v. *Walker,* 319 U. S. 744; *United States ex rel. Innes* v. *Crystal,* 319 U. S. 755; *United States ex rel. Lynn* v. *Downer,* 322 U. S. 756; *Baker* v. *Hunter,* 323 U. S. 740.

prescribed by § 11.. In its view these were adequate for the purpose. Nothing in the section or the statute, in the light of our prior decisions, can be taken to indicate that Congress intended persons charged with violating such duties to be deprived of their rights of defense on the ground of invalid classification, either absolutely should habeas corpus prove unavailable or contingently depending upon how the doubt concerning that remedy's availability might be resolved. The Government concedes that Congress intended some remedy to be available. We know of no way by which this can be assured, in such a case as Gibson's, otherwise than by permitting the defense to be raised in the criminal trial.

The analogy failing, for both of the reasons we have stated, by which it is sought to confine the remedy to habeas corpus, we think the defense has been left open for presentation in this case and should have been allowed. *Estep* v. *United States,* 327 U. S. 114; *Smith* v. *United States, ibid.*[38]

Gibson, like Dodez, and for similar reasons, insists that we should dispose of the case upon the merits, by examining and sustaining his defense. The same course should be followed for Gibson in this respect as was directed for Dodez.

We express no opinion concerning whether a different result might follow for one in Gibson's position if he should

---

[38] In this case, as in the *Estep* and *Smith* cases, the United States in a criminal prosecution is asking judicial enforcement of a draft board's command or order. In the *Estep* case, though the Act provided that the order of the draft board should be "final," limited judicial review was permitted. Section 11 of the Selective Training and Service Act does not distinguish between one order of a board and another. Provided that he has exhausted his administrative remedies, the registrant who has not been actually inducted into the armed forces may in defense to a criminal prosecution attack a board's order as arbitrary and illegal.

remain at the camp for a substantially longer period and then depart without leave.[39]

The question raised concerning venue has been determined adversely to Gibson's contention by our decision in *United States* v. *Anderson,* 328 U. S. 699.

The judgments are reversed and the causes are remanded to the District Courts from which they came, for further proceedings consistent with this opinion.

*Reversed.*

MR. JUSTICE MURPHY joins in the opinion of the Court for the reasons stated therein and for the additional reasons set forth in his dissenting opinion in *Falbo* v. *United States,* 320 U. S. 549, 555, and in his concurring opinion in *Estep* v. *United States,* 327 U. S. 114, 125.