(C. D. 1076)

GREENE CATTLE CO., INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided December 22, 1947)

*Lawrence, Tuttle & Harper* (*Walter I. Carpeneti* and *Lawrence A. Harper* of counsel) for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Daniel I. Auster* and *Charles J. Miville*, special attorneys), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges

CLINE, Judge: This is a protest arising at the port of San Francisco against the collector's assessment of duty under paragraph 701 of the Tariff Act of 1930 at the rate of 3 cents per pound on certain cattle weighing over 700 pounds which were imported from Mexico and withdrawn from bonded pasture during April 1942. Plaintiff claims that the cattle are properly dutiable at 1½ cents per pound under said paragraph, as modified by the trade agreement with Canada, T. D. 49752.

At the trial, James D. Stewart, the liquidator herein, testified that the merchandise originally entered consisted of 498 cows weighing over 700 pounds each, 29 steer calves under 700 pounds each, 97 heifer calves under 700 pounds each, and 2 horses; that after importation, 9 cows were destroyed and the balance of the 498 were liquidated dutiable; that the cows were kept in a bonded pasture until the time of withdrawal; that they were withdrawn on April 1, 1942; that 192 weighing over 700 pounds each were liquidated at 1½ cents per pound under the Mexican quota, under T. D. 49752 and T. D. 50534, and that 297 cows were liquidated at 3 cents per pound. Mr. Stewart stated that his liquidation was based upon instructions received in a letter from the Bureau of Customs. A copy of this letter is among the papers attached to the entry and states in part:

> Quota reports before the Bureau show that entries for consumption and warehouse withdrawals for consumption covering 21,132 head of this class of cattle were accepted simultaneously as of 12 Noon, Eastern War Time, at the opening of the quarterly quota period on April 1, 1942.
>
> The quota of 8,280 head for the second quarter of 1942 represents 39.1823 percent of these total imports. Therefore, of the 489 head of this class of cattle under San Francisco warehouse withdrawal No. 4657 recorded on your quota report for the week ended April 4, 1942, as accepted at 9:00 A. M., Pacific War Time, on April 1, 192 head are dutiable at 1½ cents per pound under item 701, schedule II of the trade agreement with Canada (T. Ds. 49752, 50534), and 297 head at 3 cents per pound under paragraph 701 of the Tariff Act of 1930. You will please be governed accordingly.
>
> *    *    *    *    *    *    *
>
> All other entries for consumption and warehouse withdrawals for consumption covering this class of cattle, the produce of countries other than Canada, accepted during the second quarter of the calendar year 1942, will be dutiable at the full tariff rate of 3 cents per pound.

There was received into evidence as plaintiff's collective exhibit 1 a certified copy of a statement of the Foreign Trade Division of the Bureau of the Census showing imports of cattle weighing 700 pounds or more each during 1942. According to that tabulation, 3,551 head of cattle from Mexico were entered into warehouses during April, none from Canada or other countries, and 18,357 head from Mexico were withdrawn from warehouses during April, one from Canada and none from other countries. For the entire second quarter, 7,676 head from Mexico were entered into warehouses, none from Canada or other countries, and 18,729 head from Mexico were withdrawn from warehouses, one from Canada and none from other countries.

Plaintiff claims that its entire shipment was entitled to entry at the reduced rate on the ground that the so-called Reciprocal Trade Agreements Act did not authorize the President to allocate quotas among different countries and that the President's proclamation of

the quotas for 1942 (T. D. 50534) was null and void insofar as it discriminated against other countries in favor of Canada.

The pertinent statute, trade agreement, and proclamation are as follows:

Sec. 350 of the Tariff Act of 1930, as added by 48 Stat. 943, 19 U. S. C. §1351 (the so-called Reciprocal Trade Agreements Act), extended by Joint Resolutions of Congress approved March 1, 1937 (50 Stat. 24) and April 12, 1940 (54 Stat. 107):

Sec. 350. (a) For the purpose of expanding foreign markets for the products of the United States (as a means of assisting in the present emergency in restoring the American standard of living, in overcoming domestic unemployment and the present economic depression, in increasing the purchasing power of the American public, and in establishing and maintaining a better relationship among various branches of American agriculture, industry, mining, and commerce) by regulating the admission of foreign goods into the United States in accordance with the characteristics and needs of various branches of American production so that foreign markets will be made available to those branches of American production which require and are capable of developing such outlets by affording corresponding market opportunities for foreign products in the United States, the President, whenever he finds as a fact that any existing duties or other import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States and that the purpose above declared will be promoted by the means hereinafter specified, is authorized from time to time—

(1) To enter into foreign trade agreements with foreign governments or instrumentalities thereof; and

(2) To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder. No proclamation shall be made increasing or decreasing by more than 50 per centum any existing rate of duty or transferring any article between the dutiable and free lists. The proclaimed duties and other import restrictions shall apply to articles the growth, produce, or manufacture of all foreign countries, whether imported directly, or indirectly: *Provided*, That the President may suspend the application to articles the growth, produce, or manufacture of any country because of its discriminatory treatment of American commerce or because of other acts or policies which in his opinion tend to defeat the purposes set forth in this section; and the proclaimed duties and other import restrictions shall be in effect from and after such time as is specified in the proclamation. The President may at any time terminate any such proclamation in whole or in part.

(b) Nothing in this section shall be construed to prevent the application, with respect to rates of duty established under this section pursuant to agreements with countries other than Cuba, of the provisions of the treaty of commercial reciprocity concluded between the United States and the Republic of Cuba on December 11, 1902, or to preclude giving effect to an exclusive agreement with Cuba concluded under this section, modifying the existing preferential customs treatment of any article the growth, produce, or manufacture of Cuba: *Provided*, That the duties payable on such an article shall in no case be increased or decreased by more than 50 per centum of the duties now payable thereon.

(c) As used in this section, the term "duties and other import restrictions" includes (1) rate and form of import duties and classification of articles, and (2) limitations, prohibitions, charges, and exactions other than duties, imposed on importation or imposed for the regulation of imports.

The Trade Agreement with Canada (T. D. 49752):

### ARTICLE III

If imports of any article into either country should be regulated either as regards the total amount permitted to be imported or as regards the amount permitted to be imported at a specified rate of duty, and if shares are allocated to countries of export, the share allocated to the other country shall be based upon the proportion of the total imports of such article from all foreign countries supplied by that country in past years, account being taken in so far as practicable in appropriate cases of any special factors which may have affected or may be affecting the trade in that article. In those cases in which the other country is a relatively large supplier of any such article, the Government of the country imposing the regulation shall, whenever practicable, consult with the Government of the other country before the share to be allocated to that country is determined.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

### SCHEDULE II

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

| Tariff Act of 1930; paragraph | Description of article | Rate of duty |
|---|---|---|
| 701 | Cattle, weighing seven hundred pounds or more each:<br>　Cows, imported specially for dairy purposes.<br>　Other.<br>*Provided,* That after December 31, 1938, such cattle weighing seven hundred pounds or more each (other than cows imported specially for dairy purposes) entered, or withdrawn from warehouse, for consumption in excess of 60,000 head in any quarter year shall not be entitled to a reduction in duty by virtue of this item, and such cattle (other than cows imported specially for dairy purposes) entered, or withdrawn from warehouse, for consumption in excess of 225,000 head in any calendar year shall not be entitled to a reduction in duty by virtue of this item, but the rate of duty thereon shall not exceed.<br>*Provided further,* That if, after consultation with the Government of the United States of America, the Government of Canada requests the allocation of the quantity entitled to enter at the reduced rate of duty under this item, the Government of the United States of America shall take the necessary steps to allocate the said quantity among countries of export on the basis provided for in Article III of this Agreement. | 1½¢ per lb.<br>1½¢ per lb.<br><br><br><br><br><br><br>3¢ per lb. |

\*　　　\*　　　\*

The proclamation of the President dated December 22, 1941, providing for the allocation of quotas on cattle (T. D. 50534):

WHEREAS it is provided in the Tariff Act of 1930 of the Congress of the United States of America, as amended by the Act of June 12, 1934, entitled "An Act To amend the Tariff Act of 1930" (48 Stat. 943), which amending Act, was extended by Joint Resolutions of Congress, approved March 1, 1937 (50 Stat. 24), and April 12, 1940 (54 Stat. 107), as follows:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

WHEREAS, pursuant to the said Tariff Act of 1930, as amended, I entered into a foreign Trade Agreement on November 17, 1938, with His Majesty the King of Great Britain, Ireland and the British dominions beyond the Seas, Emperor of

India, in respect of Canada, which Agreement I did proclaim and make public by my proclamations of November 25, 1938 and June 17, 1939;

  \*  \*  .  \*  \*  \*  \*  \*

WHEREAS, by my proclamation of February 27, 1939 I did proclaim the allocation among countries of export of the quantity of cattle weighing seven hundred pounds or more each (other than cows imported specially for dairy purposes) entitled to a reduction in duty by virtue of the said item 701 of Schedule II annexed to the said Agreement during the period April 1 to December 31, 1939 inclusive;

WHEREAS, by my proclamations of November 30, 1939 and November 30, 1940, such allocation was continued for the calendar years 1940 and 1941;

WHEREAS, after consultation with the Government of the United States of America, the Government of Canada has requested the Government of the United States of America to continue such allocation during the calendar year 1942;

WHEREAS such allocation is required and appropriate to carry out the said Agreement;

WHEREAS I find that, taking into account special factors affecting the trade, imports into the United States of America from all countries of such cattle weighing seven hundred pounds or more each (other than cows imported specially for dairy purposes) during the years 1936 and 1937 were representative of the trade in such articles;.

AND WHEREAS I find that the proportions of total imports into the United States of America for consumption of such cattle weighing seven hundred pounds or more each (other than cows imported specially for dairy purposes) supplied by Canada and by other foreign countries, respectively, during the years 1936 and 1937 were as follows:

Canada_____ 86.2 per centum

Other foreign countries_____ 13.8 per centum

Now, THEREFORE, be it known that I, Franklin D. Roosevelt, President of the United States of America, acting under the authority conferred by the said Tariff Act of 1930, as amended, do hereby proclaim that, unless this proclamation is subsequently modified, no more than 193,950 head of cattle weighing seven hundred pounds or more each (other than cows imported specially for dairy purposes), the produce of Canada, nor more than 31,050 head of such cattle, the produce of other foreign countries, entered, or withdrawn from warehouse, for consumption during the calendar year 1942, shall be entitled to a reduction in duty by virtue of the said item 701 of Schedule II of the said Agreement; and that, unless this proclamation is subsequently modified, no more than 51,720 head of cattle weighing seven hundred pounds or more each (other than cows imported specially for dairy purposes), the produce of Canada, nor more than 8,280 head of such cattle, the produce of other foreign countries, entered, or withdrawn from warehouse, for consumption in any calendar quarter year during 1942, shall be entitled to a reduction in duty by virtue of the said item 701 of Schedule II of the said Agreement.

Plaintiff does not claim that the President had no authority to establish a quota limiting the number of cattle which could be imported at the reduced rate but contends that the President exceeded his authority by allocating different percentages of that quota to Canada and to other countries.

While the Reciprocal Trade Agreements Act does not use the term "quota," it does give the President authority to "proclaim such modifications of existing duties and *other import restrictions,* or *such additional import restrictions,* or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder." [Italics supplied.] As set forth in subdivision (c), "import restrictions" includes "limitations, prohibitions, charges, and exactions other than duties, imposed on importation or imposed for the regulation of imports." A quota is certainly a limitation on importation and is therefore authorized by the Reciprocal Trade Agreements Act.

What kind of a quota may the President proclaim pursuant to a trade agreement? There is nothing in the Reciprocal Trade Agreements Act which indicates that any particular type of quota restriction was meant. It is to be noted that the type of quota here involved is one which fixes the maximum quantity which may be imported at a reduced rate of duty, not the maximum quantity which may be imported at all. There appear to be several different types of quota restrictions in common use. One type, the global or aggregate quota, fixes a maximum quantity which may be imported during a given period; another type grants every country the right to import the same quantity of goods at the reduced rate; and a third type allocates an amount to each country in proportion to the amount supplied by it during a representative period. *Extent of Equal Tariff Treatment in Foreign Countries* (Tariff Commission Report No. 119, Second Series); *Recommendations of the Economic Committee Relating to Tariff Policy and the Most-Favored-Nation Clause* (L. N. Pub. 1933, II B. 1).

In discussing the relation of quotas to equal tariff treatment, the Tariff Commission reported (op. cit. p. 16):

The difficulty of harmonizing a regime of quotas with equal or most-favored-nation treatment is illustrated by the major principles of allocation so far adopted by the various countries imposing quotas—apart from arbitrary allocation not resting on any principle.

1. Equal allotment of total imports among all supplying countries is unfair in that it favors imports from relatively small and possibly high-cost countries, at the expense of the normally principal suppliers.

2. Fixing of a total amount of permitted imports without allocating it among the various countries may be technically less contrary to the principle of the most-favored-nation clause than any other method, but it has seldom been used because of the advantage it gives to nearby countries which can rush in their goods most quickly.

3. Distribution among supplying countries in proportion to the imports supplied by each in a previous representative period provides the most equitable basis of quota allocation which has been found at all practicable. Obviously,

however, the selection of representative periods is not only very difficult, but can be made discriminatory. Because of the rapidity with which changes take place in production and market conditions in the various countries, it is impossible to determine from past trade what allocation best meets the present needs of all countries.

The practice of allocating quotas among various countries was recognized by the United States in commercial treaties negotiated prior to 1934. For instance, in a treaty with Austria signed June 19, 1928, and later ratified by the Senate, it is provided in Article VII:

* * * In the event of rations or quotas being established for the importation, or exportation of articles restricted or prohibited, each of the High Contracting Parties agrees to grant for the importation from or exportation to the territories of the other Party an equitable share in the allocation of the quantity of restricted goods which may be authorized for importation or exportation. * * * (47 Stat. Pt. 2, 1876, 1882).

See also the treaties entered into with Poland on June 15, 1931 (48 Stat. Pt. 2, 1507, 1513); with Finland on February 13, 1934 (49 Stat. Pt. 2, 2659, 2665); with Siam on November 13, 1937 (53 Stat. Pt. 3, 1731, 1734); with Iraq on December 3, 1938 (54 Stat. Pt. 2, 1790, 1791).

In connection with an allocation of a quota on prunes by Germany, Secretary Hull instructed Ambassador Dodd to transmit a note to the German Foreign Office to the following effect:

* * * My Government has, in principle, found serious objection to the restriction and arbitrary curtailment of trade through the adoption of quota systems. It considers that such restrictions are open to objection as being inherently discriminatory and hence as being inconsistent with the spirit of the most-favored-nation principle. It is recognized, however, that in view of the maladjustment of economic conditions throughout the world the adoption of such a system may, in the interest of national economy and as a temporary measure, in some circumstances be found to have reasonable justification. Nevertheless, my Government is strongly of the view that it is incumbent upon any country which finds it necessary for reasons of domestic economy to adopt such a system scrupulously to avoid the allocation of quotas in such a manner as to restrict the trade of one country in a degree greater than the restriction imposed upon the trade of another country. Failure to allot quotas on a proportionate basis results in the giving to one country of an advantage not equally enjoyed by another. (5 Hackworth, Digest of International Law, 286–287.)

In May 1934, Congress amended the Agricultural Adjustment Act to provide that the Secretary of Agriculture may forbid processors and handlers of sugar from importing sugar "in excess of quotas fixed by the Secretary of Agriculture, for any calendar year, based on average quantities therefrom brought into or imported into continental United States for consumption, or which was actually consumed therein, during such 3 years, respectively, in the years 1925–1933, inclusive, as the Secretary of Agriculture may, from time to time, determine to be the most representative respective 3 years, * * *." (48 Stat., Pt. 1, 672.)

It is apparent, therefore, that the allocation of quotas among different countries was not a novelty when the Reciprocal Trade Agreements Act was passed and that Congress was familiar with the practice. It is reasonable to assume, therefore, that Congress would have expressly forbidden the President to adopt the practice in connection with trade agreements, had it desired so to do.

In a memorandum submitted to the Senate Committee on Finance by Francis B. Sayre, then Assistant Secretary of State, in connection with the hearings on the Reciprocal Trade Agreements Act, he stated:

Quotas or import permits are imposed in a number of countries by the executive, either under special legislative authorization, or under general executive powers. These permits may be used to control trade balances, or to apply retaliatory measures, and the *apportionment of imports under quotas may also be used to include and enforce reciprocal trade arrangements.* (Hearings before the Committee on Finance, United States Senate, 73rd Congress, 2nd Session, on H. R. 8687, p. 50). [Italics supplied.]

The fact that Congress intended the President to have the authority to establish and allocate quotas is further evidenced by the proceedings when the Reciprocal Trade Agreements Act was extended on March 1, 1937 (50 Stat. Pt. 1, 24), on April 12, 1940 (54 Stat. Pt. 1, 107), on June 7, 1943 (57 Stat. Pt. 1, 125), and on July 5, 1945 (59 Stat. Pt. 1, 410).

During the hearings before the Ways and Means Committee in 1940, there was a discussion of the allocation of tariff quotas on petroleum pursuant to a trade agreement made with Venezuela (54 Stat. Pt. 2, 2375, T. D. 50015) and the proclamation of the President thereunder (54 Stat. Pt. 2, 2451, T. D. 50040). Assistant Secretary of State Grady testified that the petroleum quota was allocated as follows: 71 per centum to Venezuela, 20 or 21 per centum to the Netherlands, 4 per centum to Mexico, and 4 per centum to Colombia. (Ways and Means Com. (House), Extension of Reciprocal Trade Agreements Act; Hearings on H. J. Res. 407, 1940, 851 and 852.)

The report which that committee made to the House contains also the following reference to quotas:

Under the most-favored-nation principle as laid down in the Trade Agreements Act, a reduction in a duty on a product of one country is immediately extended to the like product of every other country which has not been found to be discriminating against our commerce. This principle which protects our trade against discriminatory foreign tariff treatment has also been adapted to other types of trade control such as quotas and exchange control. For example, under the provisions included in our agreements, if the other country subsequently enlarges a quota in favor of a third country, a proportionate increase must be made in favor of importations from the United States. [76th Cong., 3d sess., H. Rep. 1594, p. 39.]

In 1945, Senator Aiken stated on the floor of the Senate that under the agreement with Canada, 83 per centum of the total importation of 225,000 head of cattle a year might be imported from Canada, and

Senator Wherry stated that the quotas of cattle from Mexico and from Canada entitled to the reduced rate had been increased. (91 Cong. Rec., pt. 5, pp. 6235, 6344.)

When the matter of extending the Reciprocal Trade Agreements Act was before the Senate in 1945, Senator Robertson offered an amendment providing that no trade agreement in regard to certain textiles should be entered into unless the importation was established on a quota system based on the average imports over a 20-year period, such quota to be prorated among the various exporting countries. (91 Cong. Rec., pt. 5, p. 6359.) In opposing this amendment, Senator Barkley stated (p. 6361):

* * * Under the Trade Agreement Act the President has wide discretion in regard to quotas. He can provide in the agreement that there shall, under certain circumstances, be quotas. In our trade agreement with Mexico there is what is called an escape clause by which if importations of certain commodities reach a proportion which threatens the industries in the United States dealing in similar products, the President may reduce the importations and impose a quota. He may do the same respecting any other commodity, although I hope the committee as well as the Senate would feel it to be unwise to insert in this extension act mandatory provisions requiring quotas to be included. [Ibid. p. 6361.]

The amendment was thereupon rejected by the Senate.

It is clear from these statements that Congress was aware of the fact that quotas had been fixed under certain trade agreements and that in some cases, at least, these quotas were allocated proportionately among different countries. Since Congress, in extending the Reciprocal Trade Agreements Act, did not prohibit the President from imposing quotas and allocating them, such failure to act amounts to legislative approval of the fixing and allocation of quotas. *Norwegian Nitrogen Products Co.* v. *United States,* 288 U. S. 294, 313; *Missouri* v. *Ross,* 299 U. S. 72, 75.

In the recent case of *Fleming* v. *Mohawk Wrecking & Lumber Co.,* 331 U. S. 111, one of the questions involved was whether the President had authority to transfer the functions of the Price Administrator to another agency. The court said:

Section 1 of the First War Powers Act does not explicitly provide for creation of a new agency which consolidates the functions and powers previously exercised by one or more other agencies. But the Act has been repeatedly construed by the President to confer such authority. Such construction by the Chief Executive being both contemporaneous and consistent, is entitled to great weight. See *United States* v. *Jackson,* 280 U. S. 183, 193; *Billings* v. *Truesdell,* 321 U. S. 542, 552–553. And the appropriation by Congress of funds for the use of such agencies stands as confirmation and ratification of the action of the Chief Executive. *Brooks* v. *Dewar,* 313 U. S. 354, 361.

Plaintiff's argument is based on the contention that the Reciprocal Trade Agreements Act provides that the proclaimed duties and import restrictions shall apply to articles of all foreign countries; that the only exceptions are that the proclaimed rates may be suspended as to any

country because of its discriminatory treatment of American commerce and that preferential treatment may be given to Cuba; and that the allocation of quotas herein amounted to giving preferential treatment to Canada.

Is the allocation of a quota contrary to the most-favored-nation clause? That clause, as it appears in the Reciprocal Trade Agreements Act, provides:

* * * The proclaimed duties and other import restrictions shall apply to articles the growth, produce, or manufacture of all foreign countries, whether imported directly, or indirectly: *Provided*, that the President may suspend the application to articles the growth, produce, or manufacture of any country because of its discriminatory treatment of American commerce or because of other acts or policies which in his opinion tend to defeat the purposes set forth in this section; * * * .

The policy of granting unconditional most-favored-nation clauses in treaties made by the United States was begun in 1923; any subsequent agreements granting concessions to any one nation had to apply to these other nations. As was stated in the report of the Tariff Commission, *supra*, it is difficult to reconcile the most-favored-nation treatment with quotas of any variety, because some nation will always suffer. However, it is significant that all of the commercial treaties above mentioned which contain provisions in regard to the allocation of quotas also have most-favored-nation clauses. It seems apparent, therefore, that, internationally, the quota system was not considered irreconcilable with the most-favored-nation clause, unless used in an obviously discriminatory manner.

For instance, in a report to the League of Nations in 1933, entitled "Recommendations of the Economic Committee Relating to Tariff Policy and the Most-Favored-Nation Clause" (L. N. Pub. 1933, II B. 1, pp. 11–14), the committee observed that aggregate quotas granting each nation the right to import an equal quantity of goods might be contrary to the most-favored-nation clause, since the object of that clause was to preserve the respective positions of different countries. It concluded that proportional quotas were consonant with the clause where account was taken of the respective powers of competition of different countries and their relationship to each other was not disturbed. It also suggested that the best method of fixing proportional quotas was through an agreement with the country which was the largest supplier of the particular merchandise. It is to be noted that this method was followed in the instant case, since Canada was the largest supplier of cattle and the quota arrangements were made, pursuant to the trade agreement with her, in consultation with her.

In a work entitled *The Reciprocal Trade Policy of the United States*, Henry J. Tasca states that in regard to United States exports the

policy of the United States in its dealings with other countries is based on the principle that aggregate quotas must be allocated in such a fashion as to give this country amounts in proportion to the amounts of goods supplied by it during a representative period prior to the initiation of the controls. He concludes that "the application of quotas upon this basis is considered fair and equitable treatment." Since this country is claiming proportional quotas for its goods, it would be inconsistent to hold that the President could not grant them to other countries when negotiating trade agreements. No such inconsistency is required by the language of the statute.

The United States recognized proportional quotas as an equitable method of dividing trade in the Inter-American Coffee Agreement, dated November 28, 1940 (ratified by the Senate, February 3, 1941) which provides in Article I for basic annual quotas for the exportation of coffee to the United States from the other participating countries. (55 Stat. Pt. 2, 1145, T. D. 50372.) Thereafter, Congress passed a joint resolution providing in part that the President might make such allocations of the quota provided in the agreement for nonparticipating countries that he found necessary or appropriate. (55 Stat. Pt. 1, 133, 134.)

See also the Sugar Act of 1937 which sets up quotas for the importation of sugar from foreign countries. (50 Stat. Pt. 1, 903.)

It seems clear, therefore, that the allocation of quotas among different countries is a recognized method of limiting imports and one which is not considered in conflict with the most-favored-nation clause. While any quota restriction may work some hardship in a particular situation, the allocation of the quantity which may be imported on the basis of the amount supplied by various countries in prior years is most consonant with equitable treatment among nations. It does not, of course, provide for the contingency of a change in the relationship of the supplying nations. That is in fact the difficulty in the instant case. During the years 1936 and 1937, Canada had supplied 86.2 per centum of the cattle weighing 700 pounds or more imported into the United States, but, no doubt due to war conditions, it did not do so in 1942. Mexico, on the other hand, was in a position to fill more than the share allotted to countries other than Canada. Therefore, when a trade agreement was made with Mexico on December 23, 1942, it was provided that the quota limitations on cattle established pursuant to the trade agreement between the United States and Canada were superseded and new quotas were set up. (T. D. 50797.)

At the time that the Reciprocal Trade Agreements Act was first enacted, foreign countries were restricting trade by various limitations, including quotas. One of the purposes of the statute was to provide a method of quickly concluding trade agreements helping the Ameri-

can exporter. The President was given authority to reduce tariffs so that the United States could make concessions in return for concessions from other nations. It cannot be assumed that the President's bargaining power was to be limited insofar as quotas were concerned. Since Congress did not lay any specific prohibition on the President in this regard, and since it had an opportunity to do so when extending the Trade Agreements Act in subsequent years and did not do so, we cannot assume that it intended originally to limit the President's powers.

We hold, therefore, that the President was not acting beyond the scope of his authority under the Reciprocal Trade Agreements Act in allocating quotas of cattle entitled to the reduced rate of duty between Canada and other foreign countries. The protest is overruled and judgment will be rendered accordingly.